WILLIAM HARNESS ET AL.
vs.
THE CHESAPEAKE AND OHIO
CANAL COMPANY ET AL.          } JULY TERM, 1848.

[THE RIGHT OF EMINENT DOMAIN—INJUNCTION—INTEREST—JUDGMENT—MERGER.]

THE principle, that the right of eminent domain authorizes the government to take and appropriate private property for public uses, without making compensation to the owner, unless there is some provision in the constitution restrictive of the power, cannot be maintained in Maryland.

Such an appropriation by law, without compensation, would be in conflict with the sixth and twenty-first articles of the bill of rights, the latter of which declares—"that no freeman ought to be taken, or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty or property, but by the judgment of his peers or the laws of the land."

To say, that the legislature has such power, is to confer upon it judicial powers, and to confound those departments of government, which the declaration of rights says, shall be kept forever, separate and distinct.

The legislature of this state, has in no instance, in the exercise of the right of

eminent domain, omitted to provide compensation to the owner of the property taken for public uses ; and such provision was made by the 15th section of the act of 1824, ch. 79, passed to confirm an act of the legislature of Virginia, incorporating the Chesapeake and Ohio Canal Company. The 15th and 19th sections of the charter of this company construed,

The taking of acceptances for a pre-existing debt by a creditor, cannot have the effect of extinguishing the debt.

If the inquisition of the jury, when returned to and affirmed by the court, under the act of 1824, constitutes a debt at all, it is a debt of record, and of equal grade with a judgment, and, therefore, not merged by it.

When the company refuses or neglects to pay for the land condemned for their use, the owner has a right to call upon this court to protect, by injunction, his property from injury, until the money is paid.

The complainants were held to be entitled to interest on their claim, from the day of the affirmation of the inquisition of the jury by the court.

——

[On the 4th June, 1838, a previous inquisition having been set aside by Alleghany County Court, a new jury met and proceeded to condemn the lands of the complainants, for the use of the Chesapeake and Ohio Canal Company, one of the defendants in this cause. By their inquisition, which was affirmed by the court of said county, on the 8th of October following, the sum of $13,256 was awarded to the complainants, as damages for the lands so condemned. Shortly after the ratification of this inquisition, the company commenced operations upon the condemned lands, making some excavations upon the upper and lower ends of the line, and continued working upon them at intervals, until the years 1840 and 1841, when their operations were temporarily suspended. On the 1st April 1840, the money not being paid, the company accepted the drafts of William Harness, acting for himself, and under a letter of attorney from the other parties, payable to his order, for the amount of the inquisition, with interest from the day of its ratification. These drafts matured on the 1st December, 1840, and having been dishonored, suit was brought upon them by the payee in Alleghany County Court, and judgment was recovered, in his name, at October term, 1842. On the 2d June, 1843, a *fieri facias* was issued upon this judgment, and levied by the sheriff upon the property condemned, and upon another piece of land, supposed to belong to the company, but which was, in fact,

held by trustees for its benefit, and was by them afterwards sold, and the proceeds of sale applied to the payment of other debts than those of the complainants.

No sale was made by the sheriff under his levy, and things remained in this state until December, 1845, when the bill was filed in this cause by the complainants. At the time these drafts were accepted by the canal company, a receipt was signed by William Harness, in which he said, "I accept the same," (the accepted drafts,) "as full payment of the lands of William, Joseph and Hannah Harness," (the complainants,) "in Alleghany county, Maryland, condemned by inquisition at the instance of said canal company, and affirmed by the court of that county, at October term, 1838." The bill alleged the insolvency of the company ; that the condemned lands were the complainants' only resource for the payment of their claim ; and, that these would be rendered worthless by the passage of the canal through them, which, however, would be done, unless they were aided by an injunction. The late Chancellor granted the injunction, which, on the coming in of the answers, was continued till the hearing.]

THE CHANCELLOR :

Though respectable authorities may be found for the principle, that the right of eminent domain inherent in the sovereign power, authorizes the government to take and appropriate private property for public uses, without making compensation to the owner, unless there is some provision in the constitution restrictive of the power, I am fully persuaded, that no such principle can be maintained in this state. The decisions of the court of last resort here, as I understand them, clearly forbid the exercise of any such power.

In commenting upon the act of 1825, chapter 190, which proposed to abolish one corporation and to transfer its franchises and property to another, without the consent of the former, the Court of Appeals declared, that independently of the constitution of the United States, prohibiting the states from passing laws impairing the obligation of contracts, there

was a principle of right and justice inherent in the nature and spirit of the social compact, which restrained and set bounds to the authority of the legislature, and beyond which it could not be allowed to pass. That principle which protects the life, liberty and property of the citizen from violation in the unjust exercise of legislative power. *Regents of the University of Maryland* vs. *Williams*, 9 *G. & J.*, 409.

Chancellor Kent, in speaking of the right of eminent domain, or that inherent sovereign power which gives to the legislature the control of private property for public uses, remarks, that the constitution of the United States, and of most of the states of the Union have imposed a valuable check upon the exercise of the power, by declaring, that private property shall not be taken for public use, without just compensation; a principle, as he says, founded in natural justice and recognised by the universal law. And, he further observes, "that though it be not a constitutional principle, yet it exists with stringent force, independent of any positive provision." 2 *Kent Com.*, 339, 340, *and note.*

The only case to which I have been referred, in which it was held, that private property might be taken for public use, against the consent of the owner, and without making compensation, is that of the *State* vs. *Dawson*, 3 *Hill's Rep.*, 100. This decision was placed upon the ground, that the 5th article of the constitution of the United States, which prohibits the taking of private property for public use, without just compensation, is applicable, exclusively, and restrictive only of the powers of the general government and its functionaries; and, that as there is no restraining provision in the constitution of South Carolina, the legislative authority could not be controlled.

The weight of this authority, however, is much weakened by the dissatisfaction with it, expressed by several of the judges, and by the opinion of Mr. Justice Richardson, in support of the obligation of making compensation.

But, if it should be conceded, that the legislature of Maryland might exercise the power in question, if there was nothing in the constitution to forbid it; and, if the argument pressed

by one of the counsel for the defendants is sound, that the law-making power of the state governments is unrestrained, except by the constitution ; still, as it seems to me, the appropriation, by law, of private property to the public use, without compensating the owner, could not be tolerated.

The sixth article of the bill of rights separates the legislative, executive and judicial departments of the government, and makes the separation permanent. And, the 21st article of the same instrument says, "that no freeman ought to be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land."

These provisions were, undeniably, intended as restraints upon the legislative power, by means of the courts of justice, charged with the administration of the law. The words, "by the law of the land," which are copied from *Magna Charta*, are understood to mean, due process of law, that is, a regular trial according to the course and usage of the common law ; and the words, "the judgment of his peers," mean, a trial by jury according to the course of the same law. *2 Kent's Com.*, 13 ; 9 *G. & J.*, 412.

The legislative department of the government makes the law, or prescribes general rules for the government of the community ; but it cannot deprive an individual of his property—because, to do so, is to pronounce a sentence, and not to enact a law ; and, in the language of the Court of Appeals, to pronounce sentence without a hearing, or giving to the party whose property is taken, an opportunity of defending his rights against the attempted invasion.

This view of the subject does not interfere with the due exercise of the right of eminent domain, which gives to the legislature the power to take private property for the public use. When this power is exerted, the government is bound to provide some tribunal for the assessment of the compensation, before which the parties may meet and discuss their rights, face to face. But, to say that the legislature may, by its own act,

and without the intervention of any judicial tribunal, take an individual's property from him, when the constitution declares, he shall only be deprived of it by the judgment of his peers, or by the law of the land, is to confer upon the legislature judicial powers, and to confound those departments of the government which the declaration of rights says, shall be kept forever separate and distinct.

It is believed, however, that the legislature of this state has, in no instance, in the exercise of the right of eminent domain, omitted to provide compensation to the owner of the property, taken for the public use.

By the 15th section of the act of 1824, chapter 79, passed to confirm an act of the legislature of Virginia, incorporating the Chesapeake and Ohio Canal Company, provision is made for condemning the lands of individuals for the purpose of making the canal, in case the owners and company cannot agree, or in case the owners are incompetent, or absent from the state. The law in either of these contingencies provides a tribunal for the assessment of the compensation or indemnity to the owner, and directs that the valuation placed upon the land by this tribunal shall be paid by the canal company, to the owner or his legal representatives; and, that on payment thereof, the company shall be seized of the land condemned, either absolutely, or of such less quantity and duration of interest or estate, as may have been valued. It is very certain, therefore, that in this case, and with regard to the powers of this company, the legislature did not intend, through its instrumentality, to appropriate private property to the public use, without compensating the owner. The office of the jury, summoned under the provisions of this section of the act, is to determine the value of the land condemned; and it declares, that their valuation shall be conclusive on all persons, and shall be paid by the company to the owner of the land or his legal representatives. And the language of the law is explicit, that the title of the company, whether absolute or qualified, shall vest only on payment of the money.

However true it may be, as has been argued, that the canal

company, might, even after the inquisition of the jury had been ratified, have abandoned the route over the lands of the complainants, and thus freed themselves from any obligation to pay the valuation, still, as the company have not exercised this right, but have, on the contrary, taken possession of the land, excavated a part of it, and propose to cut their canal through the entire line, their obligation to pay the sum awarded by the jury, would seem to be incontestible. If the government had omitted in the case of this company, to provide for compensating the owners of property taken for the use of the canal, its officers and agents, upon application, would have been restrained by injunction. *Gardiner* vs. *Village of Newbury*, 2 *Johns. Ch. Rep.*, 162.

And having made provision for such compensation, and prescribing the mode, in which the amount to be paid shall be ascertained, and the canal company, having, in pursuance of the power conferred upon them, condemned and taken possession of the land of the complainants, nothing can be clearer, than the obligation to pay the money. The argument, that it would be unreasonable to require payment before the title passes, and, therefore, that such pre-payment could not have been intended by the legislature, does not seem to me applicable, because the payment and the passing of the title are simultaneous. The law says, "on payment thereof," (that is on payment of the sum awarded by the jury,) the company shall be seized. Some difference of opinion has been expressed by the courts, with respect to the period at which the compensation shall be paid, but the weight of authority, and as Chancellor Kent says, the better opinion is, that the compensation, or offer of it, must precede, or be concurrent with the seizure and entry upon private property under the authority of the state. 2 *Kent's Com.*, 340, *note.*

It is true, the 19th section of the charter of this company authorizes it to enter upon the lands of individuals, when required for the purposes of the canal, when the consent of the owners cannot be obtained, and to proceed to the execution of such works as may be requisite. "And, that the pendency of

any suit, in the nature of a writ of *ad quod damnum*, or any other proceedings, shall not hinder or delay the progress of the work."

This section, it is said, not only relieves the company from any obligation to pay, during the pendency of proceedings instituted to condemn the land, but it is insisted, the pendency of any other proceeding, such as the present for instance, is a sufficient answer to the demand of payment. In this construction of the section, I do not concur. It appears to be manifest, that the legislature had in view, proceedings instituted to condemn the land, and not any litigation, which might arise between the parties, with reference to the payment, or to enforce payment of the money, after the condemnation should be complete.

The legislature saw, that unless this power was given, the work might be delayed by spinning out the proceedings connected with the condemnation, and before the valuation could be determined, and of course before it could be paid, and the law, therefore, provides, that pending the proceedings necessary to ascertain the valuation, the progress of the work should not be arrested. The construction contended for, by the defendant, would delay the payment of the money so long as any litigation between the parties having any connection with it, could be kept on foot, though all the proceedings necessary to the condemnation should be finally concluded. If any doubt could be entertained, with regard to the construction, which, I think, should be given to this section, it would, in my opinion, be removed by the latter clause of it, which directs the courts to give precedence to controversies between the company, and the proprietors of lands sought to be condemned for public uses. This direction indicates, not only the parties to whose controversies precedence is to be given by the courts, but the subject of such controversies. They must be between the company on the one hand, and the proprietors of lands on the other, which lands the company is seeking to condemn. But to say, that after the condemnation is complete, and the amount to be paid is ascertained, any proceeding instituted by the proprietor

of the land, to protect his property, until the sum ascertained shall be paid, would justify the using the land, and at the same time withholding payment, would, in my opinion, be pushing the provision of the section in question far beyond the intention of the legislature.

If this position can be maintained, then any proceeding, legal or equitable, which the proprietors of the land condemned may adopt to protect it from injury until the value ascertained by the inquisition is paid, will be an excuse for not paying, whilst the company will be at liberty to proceed in the construction of the canal without interruption. Certainly the neglect to pay, when the sum is ascertained, is the fault of the company, of which the consequences should be visited upon them.

The principle settled by the Court of Appeals, in the case of the *Canal Company* vs. *Rail Road Company*, 4 *G. & J.*, 1, is, that every law which is to wrest from an individual his property without his consent, must be strictly construed; that is, must receive a construction which will work as little injury as possible to the individual, consistently with the great object of public utility, for which, alone, this high sovereign power can be exerted. My construction of this section, is, that it gives to the canal company, the temporary right to enter upon the land of individuals, with whom they cannot agree, and proceed with their work, during the pendency of such proceedings, whether by writ of *ad quod damnum*, or otherwise, as may be necessary to give them the title in the mode authorized by their charter; but, that after such proceedings have been concluded by the inquisition of the jury, and the affirmation of that inquisition by the court, the temporary privilege given by the act is at end, and they may be restrained by injunction, if an attempt is made to carry it further. And such, unquestionably, was the opinion of Chancellor Kent, in the case already referred to, and in the other case cited in the 2d vol. of his Com., 340, in the note.

I take it, therefore, as clear, that after the jury in this case, had fixed the amount to be paid to these complainants, and

after their finding had been affirmed by the court, the canal company had no right to enter upon, and commence cutting their canal through these lands, without paying the money, and that having so entered upon, and commenced cutting, the obligation to pay was perfect.

The language of the 15th section of the act is, that the "valuation of the jury shall be conclusive on all persons, and shall be paid by the president and directors, to the owner of the land, or his legal representative."

It seems impossible to say, in the face of such language, that there is not, and was not, when the canal company took possession of the lands of these parties, and commenced excavating their canal, an absolute, unqualified, and immediate obligation to pay the money, and that they could upon any pretext whatever delay it.

The defendants, however, contend, as already observed, that conceding all this to be true, the complainants have precluded themselves from asking the relief sought by this bill, by taking the acceptances of the company, and giving the receipt before spoken of. If the Chancellor is right in the view presented of the obligation of the company to pay before, or concurrently with the actual seizure and entry upon these lands; then it follows, that, on the 1st April, 1840, the date of the acceptances, the valuation of the jury was, and had been for some time, payable; for the evidence clearly shows, that prior to that date the defendants had entered upon the lands and commenced cutting their canal.

Assuming, then, that prior to the date of these acceptances there was due from the canal company, the sum ascertained by the jury, which sum, in the language of the charter, was to be paid by the company to the owner of the land, or his legal representatives, it was simply giving acceptances for a pre-existing debt, and it is too clear for argument, that the taking of them by the creditor could not have the effect of extinguishing the former debt. *Insurance Co.* vs. *Smith*, 6 *H. & J.*, 169; *Glenn* vs. *Smith*, 2 *G. & J.*, 508; *Wayman* vs. *Rae*, 11 *G. & J.*, 425.

22*

But it is said, that though the mere giving the acceptances would not extinguish the antecedent debt, yet that an express agreement to that effect would produce such extinguishment, and that the receipt given by Wm. Harness, in this case, is sufficient evidence of such agreement.

It is to be recollected, however, that it was not the bill or note of a third person, which was given for the debt of the company, but its own acceptance, and consequently no additional security was obtained.

A creditor might be well presumed to give up his claim upon his original debtor, upon receiving the obligation of a third person, in whose solvency he had greater confidence, but it is very difficult to assign a reason, and certainly no authority has been produced to show a motive to induce a creditor to surrender his right to resort to his original cause of action, upon merely receiving from his debtor an obligation of equal dignity.

The receipt in this case I do not understand to amount to an express agreement to look exclusively to the acceptances, and to abandon any right which the complainants may have had to insist on payment of the money, before their land was used for the purposes of the canal. It would not, in my judgment, amount to an extinguishment or payment of the precedent debt, even if the acceptances had been those of a third party, and *a fortiori*, cannot have that effect when they are merely the engagement of the original debtor.

The opinion of the Court of Appeals, in the case of *Glenn* vs. *Smith*, 2 *G. & J.*, 493, and the case of *Putnam* vs. *Lewis*, 8 *Johnson's Reports*, 389, cited with approbation by the Court of Appeals, are, I think, conclusive upon the question.

The defendants, however, insist, that even if the giving and receiving the acceptances will not have the effect contended for, still, when judgment was obtained upon those acceptances there was a merger of the original indebtedness, and the remedy of the complainants is only upon the judgment.

If, however, the inquisition of the jury, when returned to and affirmed by the court, constitutes a debt at all, it is a debt of record, and of equal grade with the judgment. The terms of

the act of assembly are, "that unless good cause be shown against the inquisition, it shall be affirmed by the court and recorded." And, therefore, assuming the inquisition, when thus affirmed and recorded, to constitute a debt, it is a debt of record, and consequently not merged by the judgment, which is of no higher dignity.

But, according to my view of this case, the question of merger does not arise. The legislature, by the act of 1824, provided a mode by which, in certain specified contingencies, this company was authorized to appropriate to its use the land of individuals without their consent, upon the condition, that they, the company, should pay therefor such a valuation as a jury should put upon it. This valuation, by the letter of the law, is made conclusive upon all persons, and is to be paid by the company, and it is only on payment thereof that the title passes.

Now, it seems to me very clear, no matter what arrangements are made between the parties for the payment of the money, or what securities may be given for it, the owner has a right at any time upon failure of the securities, to call upon the court to protect his property from injury until the money is paid. It does not appear to me to be material, whether the owner is bound in any active measures he may adopt to recover the money, to proceed exclusively upon his judgment or not. If he can show, as is shown here, that the judgment was rendered for the money which the jury fixed as the value of the land ; that it has not been paid; and that there is serious danger of irreparable injury to the owner, unless this court will interpose to hinder the company from using the property, I cannot see how his request for the aid of the court can be refused. The law says, (except during the pendency of the proceedings provided for in the 19th section,) that the owner's property shall not be taken from him, and used for the purposes of the company, until the valuation put upon it by the jury is first paid. And I cannot see how this right can depend upon the character or form of the security given by the company for the payment. If the owner has a right to insist upon the payment of the money before his property is wrested from him, (and

such right cannot be disputed,) what is to prevent him from invoking the aid of the court, for his protection, if the judgment given for the money remains unpaid.

The argument that the judgment is no more than a general lien, does not militate against this right of the owner of the land. His title to the protection of the court does not rest upon his rights as a judgment creditor, but upon the act of assembly, and upon that settled and fundamental doctrine according to which the owner of property, taken for the public use, is entitled to compensation, and as Chancellor Kent says, to have it paid before, or at least concurrently with the seizure and appropriation of it.

The complainants in this bill do not ask the court to enforce the payment of their judgment; but showing the judgment to be for the sum awarded by the jury, and stating other facts indicative of peril to their interests, unless the arm of this court is extended to their relief, they ask that the property condemned may be protected from injury until the money is paid, and this, in my judgment, they have a right to ask.

The only remaining question relates to the obligation of the company to pay interest on the sum fixed by the inquisition. The bill prays, that they may be restrained by injunction from digging their canal through the lands of the complainants mentioned and described in the inquisition, without first paying to them the sum of $13,256, with interest thereon, from the 8th day of October, 1838, or until the further order of the court.

The defendants deny their obligation to pay interest, and this is one of the principal points in dispute between the parties.

It is shown by the evidence that very shortly after the affirmation of the inquisition, on the 8th of October, 1838, the defendants entered upon the land, and commenced cutting their excavations; and, consequently, as I apprehend, their liability to pay the money was then complete. They had no right to enter upon the land at all, except under the circumstances mentioned in the 19th section, without first paying the money.

Being so liable, the obligation to pay interest would seem to

follow as of course, unless there are other circumstances exonerating them from the duty. The defendants insist that, inasmuch as the complainants have to some extent cultivated these lands since the condemnation, their responsibility for interest is removed. It would be unreasonable, certainly, that the complainants should hold and cultivate the lands, and at the same time make the defendants pay interest upon the sum awarded them by the jury, as the measure of compensation for their loss. But in view of the evidence upon this subject, and looking to the very partial and imperfect enjoyment of the property, by the complainants since the defendants commenced their operations upon the land, I cannot bring myself to consider that sufficient answer has been given to the demand of interest. If, however, the court had any doubt upon this subject, it would be removed by the conduct of the parties themselves. On the 1st of April, 1840, we have seen, the defendants accepted drafts for this money with interest from the 8th of October, 1838, upon which in October, 1842, they confessed judgments. Here then we have the solemn acknowledgment of the company, that it was liable to pay interest upon this money, twice repeated. How can this court, in the face of these acknowledgments of the company, say they are not liable to pay interest? The court must assume, and does assume, that these acceptances were given in good faith, and when the company had a reasonable expectation of paying them as they matured, and not that they were given for the purpose of taking from the complainants the right to resort to the courts for the protection of their property, if subsequent events should render it necessary, or as has been suggested, to get rid of the specification, which it is supposed the complainants may have had upon this land for the sum awarded them by the jury. The acceptances were given, as I must presume, with the expectation of paying them, and because the defendants considered themselves liable to pay the money, with interest. This was their then understanding of their obligation, and I can see nothing in the case to relieve them from the performance of it.

I shall, therefore, sign a decree perpetuating the injunction,

or at least continuing it in force, until the defendants shall pay the said sum of $13,256, with interest from the 8th of October, 1838. And shall also decree the payment of costs as against the canal company; but the plaintiffs must pay the costs of the officers of the corporation who were made defendants for the purpose of discovery. *Fulton Bank* vs. *N. Y. and Sharon Canal Company*, 4 *Paige*, 131.

[No appeal was taken from this decree.]