IVY L. LEONARD ᴇᴛ ᴀʟ. *v.* SWEPSON EARLE, Cᴏɴsᴇʀᴠᴀᴛɪᴏɴ Cᴏᴍᴍɪssɪᴏɴᴇʀ.

[No. 61, January Term, 1928.]

254

*Decided April 19th, 1928.*

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*V. Calvin Trice* and *William M. Rawls,* with whom was *Harry C. Dashiell* on the brief, for the appellant.

*Robert H. Archer, Assistant Attorney General,* and *Henry H. Johnson,* with whom was *Thomas H. Robinson, Attorney General,* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The question raised on this appeal is one of the constitutionality of an Act of the General Assembly of 1927, chapter 119, adopting a plan for the conservation of the supply of oysters in the waters of the state. Upon recommendation of a special sea food committee of representatives of the tidewater counties, appointed by the Governor to investigate and recommend remedial legislation to increase the supply, which has been decreasing for some years despite the adoption of previous conservation measures, an attempt is made in this act to provide for returning to the bottoms, after each season of oystering, a quantity of shells to which the oyster spat may attach itself for its growth. In the past, so long as oyster shells were waste, having no uses for which they could be sold, it was the practice of the packers, at

whose hands the shells were removed from the oysters and accumulated, to dump a large portion of their accumulations each year into the state waters; and this is regarded as having been an aid in the development of new oysters which was necessary to the continuation of any large supply on the bottoms, and which can best be secured for the future by continued dumping of shells. In the arguments, it has been stated that the method of returning shells to the bottoms is one resorted to in other states, especially in those bordering on the Gulf of Mexico. Shells have become salable for various commercial uses now possible, and the packers have ceased to dump them into the waters; and the present legislation seeks a continuation of the method by law. The plan devised in the act is to issue to the packers in the state special licenses to engage in their occupations upon their signing, and only upon their signing, agreements to surrender to the State Conservation Department ten per cent. of the shells from oysters shucked by them in each coming season, or the equivalent in money for the purchase of shells or seed oysters elsewhere. The full statutory provision, out of which the questions arise on appeal, is this: "It shall be unlawful for any person, firm or corporation having a fixed place of business, buying oysters and employing labor to prepare them for market to engage in the business of buying, selling, marketing, packing or canning oysters without first taking out a license to engage in such business by application to the Conservation Department of Maryland. Where any such person, firm or corporation operates more than one house for the buying, selling, marketing, packing or canning of oysters, a separate license shall be obtained for each house in which oysters are shucked or otherwise prepared for market; such license to be in the nature and form of a contract between the State of Maryland and the applicant and shall provide for the payment of a license fee of twenty-five dollars, and shall further provide that the licensee must turn over to the State of Maryland at least ten per cent. of the shells from the oysters shucked in his establishment for the current season, said shells to be removed on or before

the twentieth day of August of said season; or at the discretion of the Conservation Department its equivalent in money, the value thereof being determined at the market value of shells as of the first day of May following the close of the season. The Conservation Department shall notify each packer or canner on or before the said first day of . May whether it is its intention to take the ten per centum of the shells from oysters shucked as aforesaid, or its equivalent in money. Said license shall have effect from the first day of September in the year in which it may have been obtained until the twenty-fifth day of April, inclusive, next succeeding."

The uncertainty as to the amount of shells to be surrendered in the phrase "at least ten per cent.," is corrected by further provisions which restrict the amount to ten per cent., and we understand that no defect is found in the act as a whole because of this expression.

The appellants have been packers of oysters in Dorchester County, and on August 30th, 1927, after the act had become effective, made application for a license to carry on their business during the oystering season to begin on September 1st following, but, contending that the attached condition of a promise to turn over part of their shells or the money equivalent would be unconstitutional, refused to sign the agreement to make the surrender. Having then been refused a license, they filed their petition for a writ of mandamus to compel its issue to them free of the agreement or condition, the appellee filed an answer, the appellants filed a demurrer to the answer, and it was overruled. And the appeal is from the overruling of the demurrer. There is no question of procedure raised.

Some additional facts are presented by the papers in the case. Oysters are customarily brought to some of the Maryland packers from the waters of Virginia and New Jersey, as well as from Maryland waters; the amount has varied somewhat in past seasons, partly according to location of the packing houses, the appellants having, for instance, received two per cent. of their oysters from outside waters in

the season of 1926 to 1927, and one-third of one per cent. in the season of 1925 to 1926, while approximately sixteen per cent. of the oysters packed in the border county of Somerset came from Virginia waters. It appears also that some of the oysters to be packed by the appellants would, according to the natural course of their business, come from rented or leased bottoms in Maryland.

The objections urged on the appeal are that the condition attached to the granting of the licenses under this provision is contrary to requirements of the Constitutions of Maryland and the United States, in that it would involve a taking of private property of the packers without compensation, and an unlawful delegation of legislative power in directing that the Conservation Department shall determine whether shells or the equivalent in money shall be required from particular packers; would deny to the packers affected the equal protection of the laws in singling them out as a limited class for the exaction; and also involve a taking of private property without compensation in requiring the packers to keep and store the required ten per cent. of their shells for the department until it removes them.

The objections are to be answered for the most part, we think, upon consideration of these facts and principles: that the oysters in the state waters are originally the property of the state, that the state may subject dealing in them to limitations and conditions in the public interest, that it is in the prosecution of the business of the packers that the state supply is chiefly drawn upon and its exhaustion threatened, and that the condition to be attached to the privilege of carrying on this occupation is a safeguarding one, in substance and effect that the packers shall aid in preventing or repairing the exhaustion which the exercise of the privilege may cause. The condition, so viewed, appears to be a reasonable one, well adapted to further the public interest, and more especially the interest of the packers themselves, and we do not find any of the constitutional prohibitions to be applicable to it.

That oysters, as well as fish and game generally, are originally the property of the state, that is, of the people in their sovereign capacity, has been pointed out in previous decisions of this court. No individual has any property rights in them other than such as the state may permit him to acquire; and even when they are taken and reduced to possession by an individual, his ownership may be regulated and restrained by appropriate legislation enacted for considerations of state or the benefit of the community. "In other words, the cases hold that the question of enjoyment in this field is one of public policy and not of private right." *Stevens v. State,* 89 Md. 669, 672; *Hughes v. State,* 87 Md. 298; *Tyler v. State,* 93 Md. 309, 311; *Windsor v. State,* 103 Md. 611, 618. Such "things which are *ferae naturae* belong to the 'negative community,' in other words, are public things subject to the absolute control of the state, which, although it allows them to be reduced to possession, may at its will not only regulate but wholly forbid their taking." *Ohio Oil Co. v. Indiana No.* 1, 177 U. S. 190, 208. And limitations and conditions on private enjoyment need not be expressed as reservations of title similar to those which might be used by private grantors of property conveyed, but would regularly be such as would result merely from legislation touching the subject. *Dize v. Lloyd,* 36 Fed. 651; *McCready v. Virginia,* 94 U. S. 391; *Geer v. Connecticut,* 161 U. S. 519; *Corfield v. Coryell,* 4 Wash. C. C. 371; *Freund, Police Power,* 419, 422, 447; *Comm. v. Hilton,* 174 Mass. 29; *Brooks v. Tripp,* 135 N. C. 159; *People v. Clair,* 221 N. Y. 108; *People v. Monterey Fish Products Co.,* 195 Cal. 548. And cases reviewed in notes: *L. R. A.* 1916C 338; *Ann. Cas.* 1917B 953; 32 *A. L. R.* 337. Accordingly this court has upheld various conditions, regulations and prohibitions for the conservation of such state property; and it has upheld previous measures imposing license or occupational taxes on oyster packers as a class to meet in part the burden of conserving the supply upon which they draw. And as Judge Boyd said, in his opinion in *State v. Applegarth,* 81 Md. 293, those exactions might

be considered in the nature of fair compensation from the packers. "Such legislation on this particular subject," he said, "might well be justified on the ground that the state as owner of the oysters is entitled to a reasonable and fair compensation for them, and it may not be deemed just or wise to impose all the burden on those who oftentimes undergo great hardship and suffering catching them; and therefore those engaged in packing and canning them are called upon to contribute their share of the compensation. If the state is not to profit by sales of its property, it should at least be protected from any loss in caring for it, and those engaged in the oyster business might justly be required to contribute their proportion of the cost and expense of preserving them." And see *Applegarth v. State,* 89 Md. 140. Such license fees, or occupational taxes, may be graduated in amount according to the volume of business done in one establishment and another, and may have as their objects the furtherance of various public interests. *Ruggles v. State,* 120 Md. 553, 561; *State v. Shapiro,* 131 Md. 168, 173.

As has been argued for the appellees, the present act may be viewed as imposing a license or occupational tax, in that it makes its demand upon persons who are to engage in a particular occupation, and the demand is to be measured by the volume of business of each one affected. And it is appropriately made upon these persons because it has as its object the repair of damaging effects of the pursuit of their occupation. It seeks its ultimate purpose, the repair, more directly than does the usual occupational tax, in demanding a contribution of tangible property rather than of money with which the property might be procured. *State v. Applegarth, supra.* The material which will be needed for the repair is material which will be accumulated by the packers themselves, and contribution in kind rather than one in money seems to be a direct, convenient arrangement; and it would seem to involve no further reach of governmental power. It seems to us, however, that the act may be accurately described as establishing merely a condition upon which the oyster supply of the state may properly be drawn

upon and dealt in, or as fixing a necessary incident of the exercise of the privilege sought. The greater part of the burden of conservation, undertaken largely for the benefit of the packers, for the preservation of their livelihood, indeed, is to be borne by the state at large, and what is demanded of the packers as the condition of their license may be regarded as a measure of co-operation, one which they are peculiarly equipped to contribute. There is some novelty in exacting a contribution of tangible property, even as a measure of co-operation for the private individual's own benefit, or as the condition of a privilege, but novelty alone does not, of course, render it invalid. *State v. Applegarth, supra.*

The powers of the Legislature are not derived from grants in the Constitution of the State, or, indeed, from any classifications made use of in discussions of exercises of power; plenary power in the Legislature for all purposes of civil government is the rule, a prohibition to exercise a particular power is an exception, and can be founded only on some constitutional clause plainly giving rise to it. *Painter v. Mattfeldt,* 119 Md. 466, 472; *Kenneweg v. Allegany County,* 102 Md. 119, 122; *Marmet v. State,* 45 Ohio St. 63, 70; *Nichols, Eminent Domain,* 56. The constitutional prohibition against taking property without compensation, in article 3, section 40, of the Maryland Constitution, and that against the deprivation of property without due process of law in the Fourteenth Amendment of the United States Constitution and Article 23 of the Maryland Declaration of Rights (all of which have the same meaning and effect in reference to an exaction of property, *Harness v. C. & O. Canal,* 1 Md. Ch. 248, 252), have, as it seems to us, no bearing on an exaction made as the reasonable price or condition of a license. They are not designed to prohibit an exaction of property under any and all circumstances whatever except by condemnation proceedings to secure payment of the value in money. And a property contribution as the price or condition of a license or privilege sought, while unusual, is not unprecedented.

In the case of *Baltimore v. White,* 2 Gill, 444, concerning

a grant of the privilege of erecting a wharf off the applicant's property in Baltimore Harbor, at a time when under the law special permission for it had to be obtained from the mayor and city council, the court had to consider a condition imposed that the owners dedicate part of it to the public. And the court said in its opinion: "As the case is now before us, we are bound to presume that the extension, as proposed by the Olivers, could not, in the judgment of the city authorities, have been granted without detriment to navigation unless the injuries resulting from it were counteracted by the great facilities afforded to navigation by the surrender to its uses of the exterior margin of the improvement in the shape of a public wharf. If the city authorities believe that the unconditional grant of the power of improvement proposed by the Olivers would be ruinous to the navigation of the port of Baltimore, but that its effects would be wholly obviated by the facilities to navigation afforded by the wharf at the southern side of the improvement being dedicated to the use of the navigating public, were they not authorized, nay, were they not bound, to withhold their assent, unless such a dedication were made? Or suppose the Olivers' original application had thus proffered the dedication, ought the corporate authorities to have withheld their assent? We think not." And that exaction seems to be the same in principle as the present one. The opinion did not mention any constitutional objections, but the same prohibitions were then in force, although not yet expressed in the written constitution. 1 *Blackst. Comm.* 139; *Hepburn's Case,* 3 Bland, 98; *Compton v. Susquehanna R. R. Co.,* 3 Bland, 390; *Hamilton v. Annap. & E. R. Co.,* 1 Md. Ch. 108, 109; *Harness v. C. & O. Canal, supra; New Central Coal Co. v. Georges Creek Co.,* 37 Md. 537, 559. An exaction of private property rights was made as a condition to the grant of a privilege which could not be exercised except with the permission or license of the public authorities, acting in the interest of all the citizens, and it was considered not only lawful but one which it was the bounden duty of the authorities to make. Compare cases

reviewed in note, *Ann. Cas.* 1912A, 490; 1 *Blackst. Comm.* 358; *Galoway v. State,* 139 Tenn. 484.

The constitutional prohibitions, as is well known, are levelled against special exactions which will leave the individual possessors subjected to unequal deprivations and public burdens without regard to compensatory benefits. *Re Dorrance Street,* 4 R. I. 230, 245; *Nichols, Eminent Domain,* 49. They are levelled against exactions which, as Chancellor Johnson said, "would be at war with the great principles of natural justice." *Hamilton v. Annap. & E. R. Co., supra.* They are not concerned with exactions made as reasonable conditions or in exchange for privileges, carrying full compensation, which might be withheld except upon such co-operation and might be declined by the individuals if dissatisfied with the terms. See *Lewis, Eminent Domain,* sec. 4; *Mills, Eminent Domain,* sec. 1; *Moale v. Baltimore,* 5 Md. 314, 320.

It may be added that, as the State might exact contributions of money sufficient to buy the shells from the packers, a construction of the constitutional prohibitions, making them apply to prevent stipulations for surrendering the shells, would give those prohibitions the practical effect of denying the propriety of exacting directly a contribution which is free from objection when exacted indirectly; it would be reading the Constitutions to insist upon the form without any objection to the substance.

So far we have discussed the objections as if the shells to be contributed were all the full property of the packers to be licensed, or as if all were obtained from other than State bottoms. Some packers would, apparently, have no such shells in their accumulations, and some would have quantities which are, perhaps, negligible; but packers in the border counties would have considerable ingredients of these, and we have considered the case as if some of such outside shells might be required under the act, because they would enter into the basis of calculating the ten per cent. But the fact remains that the greater part of the accumulations, at least, will in every instance consist of shells from State

bottoms, and as to these the State would retain whatever ownership or rights might result from its conservation enactments, and in receiving those shells would in effect, merely repossess them. The right to do so, under the authorities already cited, would be one of the conditions of the privilege beyond any question, we think.

The alternative exaction of a contribution in the money equivalent, at the discretion of the Conservation Department, is objected to because of the difference it authorizes between demands upon one packer and another, and because of the delegation to the department of the power to make the election and fix the money equivalent, which is regarded as an essentially legislative and non-delegable power. As the act contemplates an election between equivalents only, it does not impose or contemplate any inequality in the amount of the exactions. The packers will hold the shells for conversion into money at the market price, and the alternative to surrendering shells to the department in kind is, in the final analysis, nothing more than paying over to the State so much of the sales price in advance of sale or, it may be, after actual sale. The burden is a slight one, no greater than other burdens necessarily imposed on individuals in practical working plans for collecting taxes, as, for instance, the burden imposed upon warehousemen to advance the owners' taxes on goods deposited, as that on retailers of gasoline and oils to collect and pay the taxes on purchases from them. *Hannis Distilling Co. v. Baltimore,* 114 Md. 680, 681. *Pierce Oil Co. v. Hopkins,* 264 U. S. 137. And we think it is to be classed with those necessary burdens, and is too slight to justify stamping the whole beneficial scheme as one involving unconstitutional discrimination among packers. And especially does this appear true when it is remembered that what is now being considered is the constitutionality of a condition upon a privilege, in a scheme for the packers' own benefit, one which appears to be about as practical and economical a scheme as can be devised.

And in the delegation to the department of power to make the election we find nothing contrary to the provisions of the

constitution. It is inaccurate to regard the department as being given power to fix the price; the price is to be the market price, fixed by the market; and if a packer of whom the money is demanded cannot agree on the market price, he can be required to pay only that which shall be judicially ascertained as such; no price can be arbitrarily fixed for him. And for the choice between shells and money, there is little left to be settled by the department. It obtains nothing but shells and seed oysters in the end, and is only to determine where it is advantageous to obtain them for the needs to be met; the needs control the election; it would be wholly impracticable to settle by legislation the election required by the many and varied considerations which would enter into the work of planting about such great areas of bottom; and unless the election could be committed to the agency doing the work, the plan of election must be abandoned; and that, we think, the Constitution does not require. The plan of obtaining shells at the localities near the planting is a reasonable and economic one, in the interest of the packers as well as of all others who deal in oysters, and without any substantial detriment to any of them. And the functions necessarily delegated to the department in charge of the work of planting is no more uncontrolled than those necessarily devolved upon other administrative agencies, and heretofore upheld by the courts. *Tighe v. Osborne,* 150 Md. 452, 460; *Faust v. Building Assoc.,* 84 Md. 192; *Ches. & Pot. Tel. Co. v. Board of Forestry,* 125 Md. 666, 675.

The burden which might fall upon packers by requiring them to hold the shells on their premises until the department removes them seems to us an unsubstantial one, to be classed with those temporary burdens incidental to the individual's compliance with a lawful public demand, such as the burden of preparing books or accounts for the assessment of taxes, entry of public officers upon private property for the purposes of preliminary surveys, seizure of milk and other merchandise for tests. *State v. Mayhew,* 2 Gill, 487, 500; *Steuart v. Baltimore,* 7 Md. 500, 516; *Lewis, Eminent Domain,* sec. 228. The requirement would, in this aspect, seem anal-

ogous to one of the holding of garbage on private property for collection, which is sometimes a requirement against the interest of the owner of the premises. *Gardner v. Michigan*, 199 U. S. 325. And apart from these considerations, this requirement also seems justified as a reasonable, or even necessary, part of a lawful condition attached to the privilege sought.

We conclude that there is no valid constitutional objection to the act.

*Order affirmed, with costs to the appellee.*