Chief Justice ROBERTSdelivered the opinion of the Court.
Under the United States Department of Agriculture's California Raisin Marketing Order, a percentage of a grower's crop must be physically set aside in certain years for the account of the Government, free of charge. The Government then sells, allocates, or otherwise disposes of the raisins in ways it determines are best suited to maintaining an orderly market. The question is whether the Takings Clause of the Fifth Amendment bars the Government from imposing such a demand on the growers without just compensation.
I
The Agricultural Marketing Agreement Act of 1937 authorizes the Secretary of Agriculture to promulgate "marketing orders" to help maintain stable markets for particular agricultural products. The marketing order for raisins requires growers in certain years to give a percentage of their crop to the Government, free of charge. The required allocation is determined by the Raisin Administrative Committee, a Government entity composed largely of growers and others in the raisin business appointed by the Secretary of Agriculture. In 2002-2003, this Committee ordered raisin growers to turn over 47 percent of their crop. In 2003-2004, 30 percent.
Growers generally ship their raisins to a raisin "handler," who physically separates the raisins due the Government (called "reserve raisins"), pays the growers only for the remainder ("free-tonnage raisins"), and packs and sells the free-tonnage raisins. The Raisin Committee acquires title to the reserve raisins that have been set aside, and decides how to dispose of them in its discretion. It sells them in noncompetitive markets, for example to exporters, federal agencies, or foreign governments; donates them to charitable causes; releases them to growers who agree to reduce their raisin production; or disposes of them by "any other means" consistent with the purposes of the raisin program. 7 CFR § 989.67(b)(5) (2015). Proceeds from Committee sales are principally used to subsidize handlers who sell raisins for export (not including the Hornes, who are not raisin exporters). Raisin growers retain an interest in any net proceeds from sales the Raisin Committee makes, after deductions for the export subsidies and the Committee's administrative expenses. In the years at issue in this case, those proceeds were less than the cost of producing the crop one year, and nothing at all the next.
The Hornes-Marvin Horne, Laura Horne, and their family-are both raisin growers and handlers. They "handled" not only their own raisins but also those produced by other growers, paying those growers in full for all of their raisins, not just the free-tonnage portion. In 2002, the Hornes refused to set aside any raisins for the Government, believing they were not legally bound to do so. The Government sent trucks to the Hornes' facility at eight o'clock one morning to pick up the raisins, but the Hornes refused entry. App. 31; cf. post, at 2442 (SOTOMAYOR, J., dissenting).
*2425 The Government then assessed against the Hornes a fine equal to the market value of the missing raisins-some $480,000-as well as an additional civil penalty of just over $200,000 for disobeying the order to turn them over.
When the Government sought to collect the fine, the Hornes turned to the courts, arguing that the reserve requirement was an unconstitutional taking of their property under the Fifth Amendment. Their case eventually made it to this Court when the Government argued that the lower courts had no jurisdiction to consider the Hornes' constitutional defense to the fine. Horne v. Department of Agriculture,569 U.S. ----, 133 S.Ct. 2053, 186 L.Ed.2d 69 (2013)(Horne I). We rejected the Government's argument and sent the case back to the Court of Appeals so it could address the Hornes' contention on the merits. Id.,at ----, 133 S.Ct., at 2063-2064.
On remand, the Ninth Circuit agreed with the Hornes that the validity of the fine rose or fell with the constitutionality of the reserve requirement. 750 F.3d 1128, 1137 (2014). The court then considered whether that requirement was a physical appropriation of property, giving rise to a per setaking, or a restriction on a raisin grower's use of his property, properly analyzed under the more flexible and forgiving standard for a regulatory taking. The court rejected the Hornes' argument that the reserve requirement was a per setaking, reasoning that "the Takings Clause affords less protection to personal than to real property," and concluding that the Hornes "are not completely divested of their property rights," because growers retain an interest in the proceeds from any sale of reserve raisins by the Raisin Committee. Id.,at 1139.
The court instead viewed the reserve requirement as a use restriction, similar to a government condition on the grant of a land use permit. See Dolan v. City of Tigard,512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); Nollan v. California Coastal Comm'n,483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). As in such permit cases, the Court of Appeals explained, the Government here imposed a condition (the reserve requirement) in exchange for a Government benefit (an orderly raisin market). And just as a landowner was free to avoid the government condition by forgoing a permit, so too the Hornes could avoid the reserve requirement by "planting different crops." 750 F.3d, at 1143. Under that analysis, the court found that the reserve requirement was a proportional response to the Government's interest in ensuring an orderly raisin market, and not a taking under the Fifth Amendment.
We granted certiorari. 574 U.S. ----, 135 S.Ct. 1039, 190 L.Ed.2d 907 (2015).
II
The petition for certiorari poses three questions, which we answer in turn.
A
The first question presented asks "Whether the government's 'categorical duty' under the Fifth Amendment to pay just compensation when it 'physically takes possession of an interest in property,' Arkansas Game & Fish Comm'n v. United States,--- U.S. ----, 133 S.Ct. 511, 518, 184 L.Ed.2d 417 (2012), applies only to real property and not to personal property." The answer is no.
1
There is no dispute that the "classic taking [is one] in which the government directly appropriates private property for its own use." Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning *2426 Agency,535 U.S. 302, 324, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)(brackets and internal quotation marks omitted). Nor is there any dispute that, in the case of real property, such an appropriation is a per setaking that requires just compensation. See Loretto v. Teleprompter Manhattan CATV Corp.,458 U.S. 419, 426-435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).
Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.
The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const., Amdt. 5. It protects "private property" without any distinction between different types. The principle reflected in the Clause goes back at least 800 years to Magna Carta, which specifically protected agricultural crops from uncompensated takings. Clause 28 of that charter forbade any "constable or other bailiff" from taking "corn or other provisions from any one without immediately tendering money therefor, unless he can have postponement thereof by permission of the seller." Cl. 28 (1215), in W. McKechnie, Magna Carta, A Commentary on the Great Charter of King John 329 (2d ed. 1914).
The colonists brought the principles of Magna Carta with them to the New World, including that charter's protection against uncompensated takings of personal property. In 1641, for example, Massachusetts adopted its Body of Liberties, prohibiting "mans Cattel or goods of what kinde soever" from being "pressed or taken for any publique use or service, unlesse it be by warrant grounded upon some act of the generall Court, nor without such reasonable prices and hire as the ordinarie rates of the Countrie do afford." Massachusetts Body of Liberties ¶ 8, in R. Perry, Sources of Our Liberties 149 (1978). Virginia allowed the seizure of surplus "live stock, or beef, pork, or bacon" for the military, but only upon "paying or tendering to the owner the price so estimated by the appraisers." 1777 Va. Acts ch. XII. And South Carolina authorized the seizure of "necessaries" for public use, but provided that "said articles so seized shall be paid for agreeable to the prices such and the like articles sold for on the ninth day of October last." 1779 S.C. Acts § 4.
Given that background, it is not surprising that early Americans bridled at appropriations of their personal property during the Revolutionary War, at the hands of both sides. John Jay, for example, complained to the New York Legislature about military impressment by the Continental Army of "Horses, Teems, and Carriages," and voiced his fear that such action by the "little Officers" of the Quartermasters Department might extend to "Blankets, Shoes, and many other articles." A Hint to the Legislature of the State of New York (1778), in John Jay, The Making of a Revolutionary 461-463 (R. Morris ed. 1975) (emphasis deleted). The legislature took the "hint," passing a law that, among other things, provided for compensation for the impressment of horses and carriages. 1778 N.Y. Laws ch. 29. According to the author of the first treatise on the Constitution, St. George Tucker, the Takings Clause was "probably" adopted in response to "the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressment, as was too frequently practised during the revolutionary war, without any compensation whatever." 1 Blackstone's Commentaries, Editor's App. 305-306 (1803).
*2427 Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in James v. Campbell,104 U.S. 356, 358, 26 L.Ed. 786 (1882), a case concerning the alleged appropriation of a patent by the Government:
"[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."
Prior to this Court's decision in Pennsylvania Coal Co. v. Mahon,260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Takings Clause was understood to provide protection only against a direct appropriation of property-personal or real. Pennsylvania Coalexpanded the protection of the Takings Clause, holding that compensation was also required for a "regulatory taking"-a restriction on the use of property that went "too far." Id.,at 415, 43 S.Ct. 158. And in Penn Central Transp. Co. v. New York City,438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court clarified that the test for how far was "too far" required an "ad hoc" factual inquiry. That inquiry required considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action.
Four years after Penn Central,however, the Court reaffirmed the rule that a physical appropriationof property gave rise to a per setaking, without regard to other factors. In Loretto,the Court held that requiring an owner of an apartment building to allow installation of a cable box on her rooftop was a physical taking of real property, for which compensation was required. That was true without regard to the claimed public benefit or the economic impact on the owner. The Court explained that such protection was justified not only by history, but also because "[s]uch an appropriation is perhaps the most serious form of invasion of an owner's property interests," depriving the owner of the "the rights to possess, use and dispose of" the property. 458 U.S., at 435, 102 S.Ct. 3164(internal quotation marks omitted). That reasoning-both with respect to history and logic-is equally applicable to a physical appropriation of personal property.
The Ninth Circuit based its distinction between real and personal property on this Court's discussion in Lucas v. South Carolina Coastal Council,505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), a case involving extensive limitations on the use of shorefront property. 750 F.3d, at 1139-1141. Lucasrecognized that while an owner of personal property "ought to be aware of the possibility that new regulation might even render his property economically worthless," such an "implied limitation" was not reasonable in the case of land. 505 U.S., at 1027-1028, 112 S.Ct. 2886.
Lucas,however, was about regulatory takings, not direct appropriations. Whatever Lucashad to say about reasonable expectations with regard to regulations, people still do not expect their property, real or personal, to be actually occupied or taken away. Our cases have stressed the "longstanding distinction" between government acquisitions of property and regulations. Tahoe-Sierra Preservation Council,535 U.S., at 323, 122 S.Ct. 1465. The different treatment of real and personal property in a regulatory case suggested by Lucasdid not alter the established rule of treating direct appropriations of real and *2428 personal property alike. See 535 U.S., at 323, 122 S.Ct. 1465.(It is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa" (footnote omitted)).
2
The reserve requirement imposed by the Raisin Committee is a clear physical taking. Actual raisins are transferred from the growers to the Government. Title to the raisins passes to the Raisin Committee. App. to Pet. for Cert. 179a; Tr. of Oral Arg. 31. The Committee's raisins must be physically segregated from free-tonnage raisins. 7 CFR § 989.66(b)(2). Reserve raisins are sometimes left on the premises of handlers, but they are held "for the account" of the Government. § 989.66(a). The Committee disposes of what become its raisins as it wishes, to promote the purposes of the raisin marketing order.
Raisin growers subject to the reserve requirement thus lose the entire "bundle" of property rights in the appropriated raisins-"the rights to possess, use and dispose of" them, Loretto,458 U.S., at 435, 102 S.Ct. 3164(internal quotation marks omitted)-with the exception of the speculative hope that some residual proceeds may be left when the Government is done with the raisins and has deducted the expenses of implementing all aspects of the marketing order. The Government's "actual taking of possession and control" of the reserve raisins gives rise to a taking as clearly "as if the Government held full title and ownership," id.,at 431, 102 S.Ct. 3164(internal quotation marks omitted), as it essentially does. The Government's formal demand that the Hornes turn over a percentage of their raisin crop without charge, for the Government's control and use, is "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." Id.,at 432, 102 S.Ct. 3164.
The Government thinks it "strange" and the dissent "baffling" that the Hornes object to the reserve requirement, when they nonetheless concede that "the government may prohibit the sale of raisins without effecting a per se taking." Brief for Respondent 35; post, at 2443 (SOTOMAYOR, J., dissenting). But that distinction flows naturally from the settled difference in our takings jurisprudence between appropriation and regulation. A physical taking of raisins and a regulatory limit on production may have the same economic impact on a grower. The Constitution, however, is concerned with means as well as ends. The Government has broad powers, but the means it uses to achieve its ends must be "consist[ent] with the letter and spirit of the constitution." McCulloch v. Maryland,4 Wheat. 316, 421, 4 L.Ed. 579 (1819). As Justice Holmes noted, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way." Pennsylvania Coal,260 U.S., at 416, 43 S.Ct. 158.
B
The second question presented asks "Whether the government may avoid the categorical duty to pay just compensation for a physical taking of property by reserving to the property owner a contingent interest in a portion of the value of the property, set at the government's discretion." The answer is no.
The Government and dissent argue that raisins are fungible goods whose only value is in the revenue from their sale. According to the Government, the raisin marketing order leaves that interest with the raisin growers: After selling reserve raisins and deducting expenses and subsidies *2429 for exporters, the Raisin Committee returns any net proceeds to the growers. 7 CFR §§ 989.67(d), 989.82, 989.53(a), 989.66(h). The Government contends that because growers are entitled to these net proceeds, they retain the most important property interest in the reserve raisins, so there is no taking in the first place. The dissent agrees, arguing that this possible future revenue means there has been no taking under Loretto. See post,at 2437 - 2440.
But when there has been a physical appropriation, "we do not ask ... whether it deprives the owner of all economically valuable use" of the item taken. Tahoe-Sierra Preservation Council,535 U.S., at 323, 122 S.Ct. 1465; see id.,at 322, 122 S.Ct. 1465("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." (citation omitted)). For example, in Loretto,we held that the installation of a cable box on a small corner of Loretto's rooftop was a per setaking, even though she could of course still sell and economically benefit from the property. 458 U.S., at 430, 436, 102 S.Ct. 3164. The fact that the growers retain a contingent interest of indeterminate value does not mean there has been no physical taking, particularly since the value of the interest depends on the discretion of the taker, and may be worthless, as it was for one of the two years at issue here.
The dissent points to Andrus v. Allard,444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), noting that the Court found no taking in that case, even though the owners' artifacts could not be sold at all. Post,at 2440. The dissent suggests that the Hornes should be happy, because they might at least get something from what had been their raisins. But Allardis a very different case. As the dissent recognizes, the owners in that case retained the rights to possess, donate, and devise their property. In finding no taking, the Court emphasized that the Government did not "compel the surrender of the artifacts, and there [was] no physical invasion or restraint upon them." 444 U.S., at 65-66, 100 S.Ct. 318. Here of course the raisin program requires physical surrender of the raisins and transfer of title, and the growers lose any right to control their disposition.
The Government and dissent again confuse our inquiry concerning per setakings with our analysis for regulatory takings. A regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking under Penn Central. That is why, in PruneYard Shopping Center v. Robins,447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), we held that a law limiting a property owner's right to exclude certain speakers from an already publicly accessible shopping center did not take the owner's property. The owner retained the value of the use of the property as a shopping center largely unimpaired, so the regulation did not go "too far." Id.,at 83, 100 S.Ct. 2035(quoting Pennsylvania Coal Co.,260 U.S., at 415, 43 S.Ct. 158). But once there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just compensation. See Suitum v. Tahoe Regional Planning Agency,520 U.S. 725, 747-748, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997)(SCALIA, J., concurring in part and concurring in judgment). That is not an issue here: The Hornes did not receive any net proceeds from Raisin Committee sales for the years at issue, because they had not set aside any reserve raisins in those years (and, in *2430 any event, there were no net proceeds in one of them).
C
The third question presented asks "Whether a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." The answer, at least in this case, is yes.
The Government contends that the reserve requirement is not a taking because raisin growers voluntarily choose to participate in the raisin market. According to the Government, if raisin growers don't like it, they can "plant different crops," or "sell their raisin-variety grapes as table grapes or for use in juice or wine." Brief for Respondent 32 (brackets and internal quotation marks omitted).
"Let them sell wine" is probably not much more comforting to the raisin growers than similar retorts have been to others throughout history. In any event, the Government is wrong as a matter of law. In Loretto,we rejected the argument that the New York law was not a taking because a landlord could avoid the requirement by ceasing to be a landlord. We held instead that "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." 458 U.S., at 439, n. 17, 102 S.Ct. 3164. As the Court explained, the contrary argument "proves too much":
"For example, it would allow the government to require a landlord to devote a substantial portion of his building to vending and washing machines, with all profits to be retained by the owners of these services and with no compensation for the deprivation of space. It would even allow the government to requisition a certain number of apartments as permanent government offices." Ibid.
As the Court concluded, property rights "cannot be so easily manipulated." Ibid.
The Government and dissent rely heavily on Ruckelshaus v. Monsanto Co.,467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). There we held that the Environmental Protection Agency could require companies manufacturing pesticides, fungicides, and rodenticides to disclose health, safety, and environmental information about their products as a condition to receiving a permit to sell those products. While such information included trade secrets in which pesticide manufacturers had a property interest, those manufacturers were not subjected to a taking because they received a "valuable Government benefit" in exchange-a license to sell dangerous chemicals. Id.,at 1007, 104 S.Ct. 2862; see Nollan,483 U.S., at 834, n. 2, 107 S.Ct. 3141(discussing Monsanto).
The taking here cannot reasonably be characterized as part of a similar voluntary exchange. In one of the years at issue here, the Government insisted that the Hornes turn over 47 percent of their raisin crop, in exchange for the "benefit" of being allowed to sell the remaining 53 percent. The next year, the toll was 30 percent. We have already rejected the idea that Monsantomay be extended by regarding basic and familiar uses of property as a "Government benefit" on the same order as a permit to sell hazardous chemicals. See Nollan,483 U.S., at 834, n. 2, 107 S.Ct. 3141(distinguishing Monsantoon the ground that "the right to build on one's own property-even though its exercise can be subjected to legitimate permitting requirements-cannot remotely be described as a 'governmental benefit' "). Selling produce in interstate commerce, although certainly subject to reasonable government regulation, is similarly not a special governmental benefit that the Government may hold *2431 hostage, to be ransomed by the waiver of constitutional protection. Raisins are not dangerous pesticides; they are a healthy snack. A case about conditioning the sale of hazardous substances on disclosure of health, safety, and environmental information related to those hazards is hardly on point.
Leonard & Leonard v. Earle,279 U.S. 392, 49 S.Ct. 372, 73 L.Ed. 754 (1929), is also readily distinguishable. In that case, the Court upheld a Maryland requirement that oyster packers remit ten percent of the marketable detached oyster shells or their monetary equivalent to the State for the privilege of harvesting the oysters. But the packers did "not deny the power of the State to declare their business a privilege," and the power of the State to impose a "privilege tax" was "not questioned by counsel." Id.,at 396, 49 S.Ct. 372. The oysters, unlike raisins, were "feræ naturæ" that belonged to the State under state law, and "[n]o individual ha[d] any property rights in them other than such as the state may permit him to acquire." Leonard v. Earle, 155 Md. 252, 258, 141 A. 714, 716 (1928). The oyster packers did not simply seek to sell their property; they sought to appropriate the State's. Indeed, the Maryland Court of Appeals saw the issue as a question of "a reasonable and fair compensation" from the packers to "the state, as owner of the oysters." Id.,at 259, 141 A., at 717(internal quotation marks omitted).
Raisins are not like oysters: they are private property-the fruit of the growers' labor-not "public things subject to the absolute control of the state," id.,at 258, 141 A., at 716. Any physical taking of them for public use must be accompanied by just compensation.
III
The Government correctly points out that a taking does not violate the Fifth Amendment unless there is no just compensation, and argues that the Hornes are free to seek compensation for any taking by bringing a damages action under the Tucker Act in the Court of Federal Claims. See 28 U.S.C. § 1491(a)(1); Monsanto,467 U.S., at 1020, 104 S.Ct. 2862. But we held in Horne Ithat the Hornes may, in their capacity as handlers, raise a takings-based defense to the fine levied against them. We specifically rejected the contention that the Hornes were required to pay the fine and then seek compensation under the Tucker Act. See 569 U.S., at ----, 133 S.Ct., at 2063("We ... conclude that the [Agricultural Marketing Agreement Act] withdraws Tucker Act jurisdiction over [the Hornes'] takings claim. [The Hornes] (as handlers) have no alternative remedy, and their takings claim was not 'premature' when presented to the Ninth Circuit.").
As noted, the Hornes are both growers and handlers. Their situation is unusual in that, as handlers, they have the full economic interest in the raisins the Government alleges should have been set aside for its account. They own the raisins they grew and are handling for themselves, and they own the raisins they handle for other growers, having paid those growers for all their raisins (not just the free-tonnage amount, as is true with respect to most handlers). See supra,at 2424 - 2425; Tr. of Oral Arg. 3-4. The penalty assessed against them as handlers included the dollar equivalent of the raisins they refused to set aside-their raisins. 750 F.3d, at 1135, n. 6; Brief for Petitioners 15. They may challenge the imposition of that fine, and do not have to pay it first and then resort to the Court of Federal Claims.
Finally, the Government briefly argues that if we conclude that the reserve requirement effects a taking, we should remand *2432 for the Court of Appeals to calculate "what compensation would have been due if petitioners had complied with the reserve requirement." Brief for Respondent 55. The Government contends that the calculation must consider what the value of the reserve raisins would have been without the price support program, as well as "other benefits ... from the regulatory program, such as higher consumer demand for raisins spurred by enforcement of quality standards and promotional activities." Id.,at 55-56. Indeed, according to the Government, the Hornes would "likely" have a net gain under this theory. Id.,at 56.
The best defense may be a good offense, but the Government cites no support for its hypothetical-based approach, or its notion that general regulatory activity such as enforcement of quality standards can constitute just compensation for a specific physical taking. Instead, our cases have set forth a clear and administrable rule for just compensation: "The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking.' " United States v. 50 Acres of Land,469 U.S. 24, 29, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984)(quoting Olson v. United States,292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)).
Justice BREYER is concerned that applying this rule in this case will affect provisions concerning whether a condemning authority may deduct special benefits-such as new access to a waterway or highway, or filling in of swampland-from the amount of compensation it seeks to pay a landowner suffering a partial taking. Post,at 2435 - 2436 (opinion concurring in part and dissenting in part); see Bauman v. Ross,167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897)(laying out of streets and subdivisions in the District of Columbia). He need not be. Cases of that sort can raise complicated questions involving the exercise of the eminent domain power, but they do not create a generally applicable exception to the usual compensation rule, based on asserted regulatory benefits of the sort at issue here. Nothing in the cases Justice BREYER labels "Baumanand its progeny," post, at 2435, suggests otherwise, which may be why the Solicitor General does not cite them.*
*2433 In any event, this litigation presents no occasion to consider the broader issues discussed by Justice BREYER. The Government has already calculated the amount of just compensation in this case, when it fined the Hornes the fair market value of the raisins: $483,843.53. 750 F.3d, at 1135, n. 6. The Government cannot now disavow that valuation, see Reply Brief 21-23, and does not suggest that the marketing order affords the Hornes compensation in that amount. There is accordingly no need for a remand; the Hornes should simply be relieved of the obligation to pay the fine and associated civil penalty they were assessed when they resisted the Government's effort to take their raisins. This case, in litigation for more than a decade, has gone on long enough.
The judgment of the United States Court of Appeals for the Ninth Circuit is reversed.
It is so ordered.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co.,200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.