CHEHARDY, C.J. | ^Plaintiffs, Angela and Mark Magee, appeal the 24th Judicial District Court’s judgment of January 17, 2017 awarding plaintiffs supplemental compensation for the appropriation of their property by defendant, the West Jefferson Levee District. The plaintiffs also appeal the district court’s March 6, 2017 judgment awarding attorneys’ fees. For the reasons that follow, we amend in part and affirm as amended the court’s January, 17, 2017 judgment, and affirm the court’s March 6, 2017 judgment. FACTUAL AND PROCEDURAL HISTORY In 1998, plaintiffs purchased a tract of property on Walker Road in Belle Chasse, Louisiana. The approximate 6-acre property fronts on the Hero Canal and is protected by an earthen levee. At the time of the purchase, the property was encumbered by a levee servitude, as well as railroad and utility servitudes. In 2000, a levee-heightening project commenced along the Hero Canal that affected plaintiffs’ property. Plaintiffs granted Plaquemines Parish a servitude over their property for the project. In addition to cash consideration for this servitude, a gravel road that was built over the levee for the project was to be left in place after its completion for plaintiffs’ use. After the levee heightening was completed, plaintiffs began construction of their “dream home” in 2004. The custom-built approximate' 4,00(Usquare-foot raised home was constructed out of concrete and steel to withstand hurricane force winds— indeed, it survived Hurricane Katrina. The house included an approximate 3,000-square-foot wraparound covered porch and other select features, such as double-insulated windows, a custom kitchen, and an elevator. The first floor was fourteen feet above the concrete slab. On the slab level was covered parking space and an enclosed workshop out of which Mr. Magee performed marine construction and repairs. Plaintiffs also constructed a dock on the Hero Canal that was accessed 12by the gravel road and where Mr. Magee moored his boat. The house was completed' and certified for occupancy, on June 15, 2005. Almost four years later, in a letter dated February 6, 2009, plaintiffs learned of another impending- levee enhancement project. In that letter, the West Jefferson Levee District (“the Levee District”) ■ advised plaintiffs that a variety of surveys, assessments, .-and tests would be performed on or around their property in connection with the U.S. Army. Corps of Engineers West Bank and Vicinity Hurricane Protection Project. Subsequently, in a letter dated December 22, 2009, plaintiffs were advised that “[sjhould a portion of your property be required for the construction of this levee upgrade, and should you be displaced by the project, you may be eligible for Relocation Assistance Benefits.” Then, in a letter dated January 27, 2010, plaintiffs were notified that a portion of their property had been appropriated for the project. This letter advised:' [O]n January 25, 2010, the Board of Commissioners for the Southeast Louisiana Flood Protection Authority-West, convened in a Regular Monthly Meeting, for and on behalf of the West Jefferson Levee District, appropriated land owned by Mr. Mark L. and Mrs. Angela D. Magee, determined by the U.S. Army Corps of Engineers to be necessary for construction of -the Hero Canal Reach .One, Second Lift Levee Enlargement, West Bank and Vicinity. Hurricane .Protection Project. - • Attached to this letter was a copy of the appropriation resolution as well as surveys ■and maps. The resolution specified by reference to the attached maps that a certain portion of the land would be subject to a permanent servitude and another portion would be subject-to a temporary servitude. The temporary servitude would be effective for three years “or until completion of construction,-; whichever occurs later.” However, about nine months later, in a letter dated October 6, 2010, the Levee District advised plaintiffs that pursuant to the U.S. Army Corps of Engineers’ determination that the three-year temporary servitude ■ was no longer necessary, the Bóard of Commissioners for the Southeast Louisiana Flood | ^Protection Authority-West convened on September 28, 2010 and terminated the temporary servitude. Thereafter, the property wak appraised by five experts to determine its market value before and after the appropriation for purposes of calculating the just compensation owed to plaintiffs. The experts explained there are three methods to assess market value: the income approach, the cost approach, and the comparable approach. The income approach is utilized in scenarios where the property generates income, typically in the form of rents. None of the experts found the income approach applicable and so none of the five appraisals utilized it in this case. The cost approach is generally defined as the estimated replacement cost of the property less depreciation plus land value as if it were vacant. And, in the comparable approach,, the subject property is compared to the most recent, similar, and proximate market sales. The Louisiana Supreme Court has recognized, in the expropriation context, that “[tjhe jurisprudence has generally held that the ‘market approach,’ or the use of comparable sales in the vicinity of the land sought to be expropriated, is the primary tool of analysis of fair market value because it is, in most cases, likely to produce ' more accurate results,” Exxon Pipeline Co. v. Hill, 00-2535 (La. 5/15/01), 788 So.2d 1154, 1163. Henry W. Tatje, III was retained by the Levee .District to appraise the property in 2010, He exclusively employed the comparable approach in his appraisal. Utilizing January 25, 2010 as the effective date, he estimated the value of the property before the appropriation at $595,000 and the value after at $102,000. Accounting for the loss of value from the terminated three-year temporary servitude at $4,800, Mr. Tatje concluded the just compensation owed to plaintiffs was $497,800. Wayne Sandoz was also retained by the Levee District to appraise the property in 2010. Though he performed both the cost approach analysis and the |4comparable approach analysis, Mr. Sandoz explained that he gáve “almost exclusive weight” to the comparable approach in his appraisal of the property. Utilizing January 25, 2010 as the effective date, he estimated the value of the property before at $545,000, the value after at $98,700, and the value of the terminated three-year temporary servitude at $2,700.[1] Mr. Sandoz concluded the just compensation' owed to plaintiffs was $446,300. Richard Murphy was retained by the Louisiana Property Acquisition Company, LLC (“LaPAC”)[2] to appraise the property in 2010. Similar to Mr. Sandoz, though Mr. Murphy performed both the cost approach analysis and the comparable approach analysis, he gave “full weight” to the comparable approach in his appraisal of the property. Utilizing January 25, 2010 as the effective date, he estimated the value of the property before at $644,745, the value after at $105,528, and the value of the terminated three-year temporary servitude at $3,237.[3] Mr. Murphy concluded the just compensation owed to plaintiffs was $539,217, Byron Keith Core was retained by the Louisiana Office of Coastal Protection and Restoration Authority to . appraise the property in 2010. He employed both the cost approach and the comparable approach in his appraisal. Utilizing .January 25, 2010 as the effective date, he estimated the value of the property before at $720,000 and the value after at $139,688. Accounting for the loss of value from the terminated three-year temporary servitude at $3,660, Mr. Tatje concluded the. just compensation owed to plaintiffs was $583,972.-. • Mr. Core’s appraisal was adopted as the official appraisal of the property, and in a letter dated February 11, 2011, LaPAC advised plaintiffs . that the just 1 {¡compensation due .them was $583,972. Enclosed in the letter was a check from the Louisiana Department of the Treasury dated February 11, 2011 in the amount of $583,372 and a check from LaPAC dated February 11, 2011 in the amount of $600, made payable to plaintiffs.[4] This letter further advised plaintiffs: “[W]e ask that you please sign the Check Receipts acknowledging receipt of the referenced checks and return them to us in the self addressed postage paid envelope. Execution of these receipts will hot impair your right to contest the ampunt of just compensation.” On April 18, 2011, plaintiffs executed a Statement of Abandonment, in which they “disclaim[ed], waive[d] and abandon[ed] any and all right, title and interest in and to any and all personal property, located or about street address 719 Walker Road, Belle Chasse, Louisiana[.]” Plaintiffs’ home was demolished sometime in May of 2011. On December 12, 2011, plaintiffs filed suit, contesting the amount of just compensation. As the litigation progressed, plaintiffs retained expert Dr. Wade Ragas to appraise the property in 2014. He employed both the cost approach and the comparable approach in his appraisal. Utilizing April 18, 2011 as the effective date, he estimated the value of the property before at $1,325,000 and the value after at $149,600. Accounting for the loss of value from the terminated three-year temporary servitude at $4,109, Dr. Ragas concluded the just compensation owed to plaintiffs was $1,179,509. Plaintiffs accordingly amended their petition seeking $595,537 (the difference between $1,179,509 and $583,972), plus compensation for the loss of rental income, the loss of business income, the increased costs of conducting their business elsewhere, and damages to the remainder of their property. IiA four-day bench trial commenced on September 7, 2016 where extensive expert testimony was taken. The court issued its judgment on January 17, 2017, finding the fair market value of plaintiffs’ property, as of January 25, 2010, was $754,430 and the value after $100,000. Accounting for the loss of value from the terminated three-year temporary servitude at $4,000, the court concluded the just compensation owed to plaintiffs was $658,430. Crediting the sum of $583,972 already paid to plaintiffs, the court rendered judgment in favor of plaintiffs and against the West Jefferson Levee District in the amount of $74,458, together with legal interest thereon from the date of judicial demand and for all costs of the proceedings. The court followed this judgment with written reasons on January 26, 2017, offering an explanation for its findings and calculations. On March 6, 2017, the court issued a separate judgment awarding attorneys’ fees at 25 percent of the $74,458 judgment and $5,000 for fees related to plaintiffs’ expert. Plaintiffs appeal both the January 17, 2017 and March 6, 2017 judgments. ASSIGNMENTS OF ERROR On appeal, plaintiffs assign five errors: (1) The district court erred in finding that the Levee District’s failure to adhere to the mandatory requirements of La. R.S. 38:301 did not convert the taking of the ■ Magee property from a protected appropriation for hurricane and- flood protection projects to some other form of condemnation. (2) The district court erred in its market valuation of the Magee property, including the date applied for valuation purposes. (3) By finding that the appropriation statute applied to the taking of the Magee property, the district court erred in fixing attorneys’ fees at twenty-five percent of the judgment entered on January 17, 2017. (4)- The district court erred in ordering legal interest on the $74,458 judgment from the date of the judicial demand rather than from the date of taking. (5) The district court erred in fixing fees of the Magees’ expert, Dr. Wade Ragas, at $5,000. ^DISCUSSION Before considering plaintiffs’ assignments of error, we think it useful to first set forth some general precepts governing this matter. Governmental takings of property are limited by both the federal and state constitutions. S. Lafourche Levee Dist. v. Jarreau, 16-788 (La. 3/31/17), 217 So.3d 298, 305. The Fifth Amendment of the United States Constitution, made applicable to the states pursuant to the Fourteenth Amendment, provides: “No person shall.. .be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation.” Id. The definition of “just compensation” required by the Fifth Amendment has repeatedly been held to be measured by “the market value of the property at the time of the taking.” Id. (quoting Horne v. Department of Agriculture, — U.S. -, 135 S.Ct. 2419, 2432, 192 L.Ed.2d 388 (2015)). The Louisiana Constitution of 1974 provides for governmental takings of property in both Article I, § 4 and Article VI, § 42. Jarreau, 16-788, supra. Article I, § 4 provides for the expropriation of private property for public purposes, while Article VI, § 42 provides specifically for the appropriation of private property necessary for levee or levee drainage purposes. Id. Appropriation, as opposed to expropriation, is carried out by a resolution of the appropriating authority, without the need for a judicial proceeding. Jarreau, 16-788, supra (citing Richardson & Bass v. Board of Levee Commissioners, 226 La. 761, 77 So.2d 32 (1954)); see also 1A Frank L. Maraist, Civil Law Treatise, Civil Procedure—Special Proceedings, § 9.9, at 183 (1st ed. 2005). Thus, the “right of appropriation has been characterized as the right to act first and talk later.” Wynat Dev. Co. v. Bd. of Levee Comm’rs, 97-2121 (La. 4/14/98), 710 So.2d 783, 785, cert. denied, 525 U.S. 1017, 119 S.Ct. 542, 142 L.Ed.2d 451 (1998). I «The difference between a Louisiana landowner’s protection against appropriation of property necessary for levee and levee drainage purposes, which is excepted .from the protections of Article I,.§ 4,[5] and expropriation for any lawful purpose, arises from the particular nature of the levee servitude and the way in which it was traditionally exercised by public bodies. Jarreau, 16-788, supra. “The constitutional justification for the power of appropriation rested on the theory that the State and its sovereign predecessors in title have never granted a perfect title in any riparian lands to any private person sineó the settlement of Louisiana.” Delaune v. Kenner, 550 So.2d 1386, 1389 (La. App. 5th Cir. 1989), writ denied, 553 So.2d 475 (La. 1989). Indeed, lands fronting navigable rivers have long been burdened in Louisiana by the legal servitude únder La. C.C. art. 665 [6] for the construction and maintenance of levees. See 4 A.N. Yiannopoulos, Civil Law Treatise, Predial Servitudes,' § 11:15, at 660 (4th ed. 2013); Jarreau, 16-0788, supra at 308 (noting that riparian land has been burdened by public servitudes and onerous levee obligations since before the Louisiana Purchase). Accordingly, lands used or destroyed for levee purposes “were not ‘expropriated’ but merely ‘appropriated’ for levee construction and the payment is an indemnity for the public use.” See Yiannopoulos, supra at 663. “Appropriation involves the taking of a servitude whereas expropriation may involve the taking of ownership.” Yiannopoulos, supra at 663 n.20; aceord Delaune, supra (“While appropriation of land does not vest, title in the State, expropriation of land does.”). ^Because the matter at hand concerns the taking of land for levee purposes via appropriation, we turn to Article VI, § 42 of the Louisiana Constitution/which provides: A. Compensation.—Notwithstanding any contrary provision of this constitution, lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes shall be paid for as provided by law. With respect to lands and improvements actually used or destroyed in the construction, enlargement, improvement, or modification of federal or non-federal hurricane protection projects,, including mitigation related thereto, such payment shall not exceed the amount of compensation authorized under Article I, Section 4(G) of this constitution. However, nothing contained in this Paragraph with respect to compensation for lands and improvements shall apply to batture or to property the control of which is vested in the state or any political subdivision for the purpose of commerce. If the district has no other funds or resources from which the payment can be made, it shall levy on all taxable property within the district a tax sufficient to pay for property used or destroyed to be used solely in the district where collected. B. Appropriation.—Nothing in this Section shall prevent the appropriation of such property before payment. La. R.S. 38:301 implements the foregoing constitutional directive for compensating the appropriation of land for levee purposes. Subsection La. R.S. 38:301(C)(l)(h), which applies when property is taken by way of a permanent levee servitude, provides in pertinent part: The measure of compensation for lands and improvements taken or destroyed for levee and levee drainage purposes by way of a permanent levee servitude shall be the fair market value of the property taken or destroyed before the proposed use of the property or construction of the levee facilities, without allowing any change in value caused by the construction of the levee facilities. With these precepts in mind, we now turn to plaintiffs’ assignments of error. Assignment of Error One In plaintiffs’ first assignment of error, they argue that the Levee District’s failure to comply with specified requirements of La. R.S. 38:301 rendered the appropriation invalid and converted it into some other type of condemnation, like |inan expropriation, entitling them to the market value of their property as calculated by their expert Dr. Ragas. Plaintiffs submitted this same argument to the district court below, which the court rejected, finding plaintiffs, had - offered no statutory or jurisprudential authority for their position. Here on appeal, plaintiffs submit four cases they contend support their position. These cases generally stand for the proposition that expropriation pursuant to La. R.S. 48:441, et seq. demands strict compliance with governing law. As an issue of legal interpretation, we review this matter de novo, without deference to the legal conclusions of the court below. In re Reinstatement of S & D Roofing, LLC, 16-85 (La. App. 5 Cir. 9/22/16), 202 So.3d 177, 179. Plaintiffs’ submit State ex rel. Dep’t of Highways v. Bordages, 156 So.2d 617 (La. App. 3rd Cir. 1963), in which the Third Circuit affirmed the annulment of an expropriation for failure to comply with governing law. There, the Louisiana Department of Highways expropriated a temporary servitude affecting one tract of land in accordance with the provisions of La. R.S. 48:441, et seq. Bordages, 156 So.2d at 618, Later, the Department obtained a supplemental order of expropriation purporting to vest it with title to a new temporary servitude affecting an entirely different tract of land, but in this latter proceeding the Department did not comply with certain provisions of La. R.S. 48:441, et seq. Bordages, 156 So.2d at 618. Some landowners affected by this supplemental expropriation challenged it on the grounds of non-compliance with the law. Id. at 619. The district court agreed with the landowners and ordered the supplemental expropriation rescinded. Id. The Third Circuit affirmed on appeal. Id. at 621. In Gray v. State, 250 La. 1045, 202 So.2d 24 (1967), the Louisiana Supreme Court considered landowners’ claims for damages ex delicto against the Louisiana Department of Highways for the taking under the supplemental expropriation held invalid in Bordages, supra. The trial court had rejected the landowners’ claims for | ¶1 damages ex delicto, concluding their recovery is limited under the constitution and law to the market value of the temporary servitude. Gray, 202 So.2d at 28. The Third Circuit reversed and held the Department responsible for damages ex de-licto, reasoning that the taking of the land was tortious and that the Department and its contractor were trespassers in legal bad faith, liable for the value of the dirt taken and used in the construction of the highway. Id. On certiorari review, the Louisiana Supreme Court posed the issue as follows: [T]he issue in the case is essentially whether an action ex delicto will lie for the recovery of damages resulting from an intentional appropriation (actually an expropriation which, as hereinafter pointed out, has been determined illegal for failure to comply strictly with certain constitutional .and statutory requirements) by the State of private property for a public use or whether the landowner’s right to compensation is confined to recovery of the market value of the property appropriated together with such severance damages he sustained as a result of the taking. Gray, supra at 26. The Court answered this, in the negative, rejecting the Third Circuit’s finding that the Department acted in bad faith so as to justify damages ex delicto. Gray, supra at 28-30. The Court reasoned: Although the temporary servitude on the west side of the highway was taken for public purposes and unquestionably in good faith, the supplemental order was nevertheless invalid by reason'of the Department’s failure to comply with the law. Accordingly, the taking must, perforce, be regarded as an appropriation of private property for public purposes for which the landowners are enti-tied to the recompense provided by our Constitution and laws. Id. at 28-29. In State ex rel. Dep’t of Highways v. Poole, 243 So.2d 539, 541 (La. App. 1st Cir. 1970), the First Circuit affirmed the trial court’s dismissal of a Louisiana Department of Highways’ expropriation order on the ground that the Board of Highways which had obtained the expropriation was illegally constituted. The court of appeal held: “An expropriation proceeding which is void in its inception |12cannot create rights or privileges under a statute which contemplates expropriation in accordance with a procedure established by law.” Poole, 243 So.2d at 548. And lastly, in State ex rel. Dep’t of Highways v. Boudreaux, 401 So.2d 428 (La. App. 1st Cir. 1981), considering the holding of Bordages that La. R.S. 48:441, et seq. demands strict compliance, the Third Circuit held that title to property expropriated pursuant to La. R.S. 48:441, et seq. did not'vest in the Louisiana Department of Highways until the expropriation order named the correct landowner in accordance with law. 401 So.2d at 431. Upon our review of these cases, we find they do not support plaintiffs’ contention that non-compliance with La. R.S. 38:301 entitles plaintiffs to the additional compensation they seek. Most notably, these four cases dealt with the expropriation of land for highway purposes pursuant to statutory and constitutional authorities that do not govern the matter at hand.[7] Nevertheless, we consider the effect, if any, of the Levee District’s alleged non-compliance with La. R.S. 38:301. First, plaintiffs argue that the Levee District did not comply with La. R.S. 38:301(C)(l)(f) when it failed to identify with sufficient specificity the property appropriated. La. R.S. 38:301(C)(l)(f) provides: “It shall be the duty of the appropriating agency to specify and delineate at the time of the appropriating resolution, whether areas taken shall be burdened with a permanent levee servitude or a temporary servitude for levee construction purposes.”. Plaintiffs contend they were first notified of the appropriation of their property in the January 27, 2010 letter, to which was attached the appropriating resolution as well as surveys and maps purporting to depict the property to be appropriated. The resolution specified by reference to the attached maps that a certain portion of the land would be subject to a permanent servitude and another portion would be subject to a | ^temporary servitude. Plaintiffs claim the attached maps were inaccurate, which, in fact, they were. In a follow-up letter of February 8, 2010, the Levee District explained: “Subsequent to transmission of [the January 27, 2010] letter we discovered a clerical error that resulted in our transmission of a set of maps not applicable to the board’s action. We sincerely apologize for that error and have enclosed the correct maps.” The Levee District further provided plaintiffs with an additional map attached to the October 6, 2010 letter. Plaintiffs allege these subsequent maps and/or surveys did not adequately remedy the problem, as Ms. Magee stated at trial: “All of the survey maps are different. It was confusing.” As a result, they maintain that the Levee District failed to comply with La. R.S. 38:301(C)(l)(f). Plaintiffs’ argument rests on the assumption that the appropriating agency’s duty under La. R.S. 38:301(C)(l)(f) “to specify and delineate.. .whether areas taken shall be burdened...” includes notifying the landowner(s) of those specifications and delineations. They offer ho support for this assumption and our interpretation of the statutory language does not support it. Statutory interpretation begins with the language of the statute itself. Ryan Gootee Gen. Contr., LLC v. Plaquemines Par. Sch. Bd. & One Constr., Inc., 15-325 (La. App. 5 Cir. 11/19/15), 180 So.3d 588, 600. In considering statutory language, the words of a law must be given their generally prevailing meaning; and words of art and technical terms must be given their technical meaning when a law involves a technical matter. La. C.C. art. 11. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9. When the words of the law are ambiguous, however, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. La. C.C. art. 12. And when |14the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. La. C.C. art. 10. We find the language of La. R.S. 38:301(C)(l)(f) is clear, unambiguous, and its application does not lead to absurd consequences. The plain language of this provision does not require the appropriating agency to inform -or provide notice to the landowner whether areas taken shall be burdened by permanent or temporary levee servitudes. ‘That duty to notify the landowner of the appropriation is imposed by La. R.S. 38:201(C)(l)(b)(i): “The owner shall be given written notice of the appropriating resolution by the levee board within ten days of the date of its passage.” (And the record reflects that the Levee District complied with this notice requirement). Conversely, the duty under La. R.S. 38:301(0(1)© only requires the agency “to specify and delineate at the time of the appropriating resolution, whether areas taken shall be burdened with a permanent levee servitude or a temporary servitude for levee construction purposes.” The Levee District’s compliance with this duty is evidenced in the following portion of the January 25,2010 resolution: NOW THEREFORE, BE IT RESOLVED by the Board of Commissioners of the Southeast Louisiana Flood Protection Authority-West, in legal Session assembled, for and on behalf of the West Jefferson Levee District, that: 1. That portion of thé lands situated in the Parish of Plaquemines on the west side of the Mississippi River-as shown on COE Map Identified drawings 1 through 4, last revised August 17, 2009, approved by the U.S. Army Corps of Engineers, New Orleans District Commander on December 18, 2009, said lands depicted in shades of red (permanent servitude) and yellow (temporary servitude) on the map sheet attached hereto as EXHIBIT A consisting of three (3) pages and made [pjart hereof, be and the same are hereby appropriated in permanent servitude (depicted in shades of red) and temporary servitude (depicted in yellow) in accordance with the provisions of the constitution and the laws of the State of Louisiana. hi/We conclude that the Levee District’s omission of the correct maps from its letter of January 27, 2010 does not render it non-co.mpliant with La. R.S. 38:301(C)(l)(f). Second, plaintiffs contend ■ the Levee District failed to comply with La. R.S. 38:301(C)(2)(a) when its payment to plaintiffs occurred more than 'one year after the appropriation. La. R.S. 38:301(C)(2)(a) provides: “The compensation due under the provisions of this Subsection shall be paid to the owner within one year after the actual taking, use, damage, or destruction of the property in accordance with the provisions of this Section.” Plaintiffs submit that the Levee District’s payment on February 11, 2011 was more than one year after the January 25, 2010 resolution appropriating the property; .and the Levee District concedes that the payment was late. We agree with plaintiffs that the Levee District’s payment of February 11, 2011 did not comply with La. R.S. 38:301(C)(2)(a). However, as we discuss further herein, this non-compliance does not warrant the relief plaintiffs seek. Lastly, plaintiffs argue that the Levee District failed to comply with La. R.S, 38:301(C)(l)(c) when it informed plaintiffs in the February 11, 2011 letter: “[W]e ask that you please sign the Check Receipts acknowledging receipt of the referenced checks and return them to us in the self addressed postage paid envelope. Execution of these receipts will not impair your right to contest the amount of just compensation.” La. R.S. 38:301(C)(l)(c) provides: Payment by the federal, state, or local government, under existing or prior law, for the loss of lands or improvements used, damaged, or destroyed for levee or levee drainage purposes shall constitute payment in full for the exercise of a permanent levee servitude as provided by law over the lands and improvements when taken, used, damaged, or destroyed. No additional payment shall be due the owner for future work performed on, or the future taking, use, damage, or destruction of, the same lands or improvements over which the | uipermanent servitude is taken and for which any compensation has been paid, for levee or levee drainage purposes. Plaintiffs contend' that the Levee- District’s advice- in the February 11, 2011 letter that they have a right to contest the amount of just compensation violates La. R.S, 38:301(C)(l)(c)’s mandate that “Payment.. .shall constitute payment in full[.]” Under this proposed interpretation, plaintiffs seem to be advancing the paradoxical position that contesting the amount of just compensation is not permitted by law. Contesting the amount of just compensation is the basis of plaintiffs’ lawsuit and this present appeal. We reject this interpretation. We agree with the Fourth Circuit’s interpretation that La. R.S.. 38:301(C)(l)(c) “clearly evidence^] a legislative intent that the appropriating authority be required to pay only once for the levee servitude and the ensuing damage caused by it, regardless of what further work may be, done in the future.” Vela v. Plaquemines Par. Gov’t, 00-2221 (La. App. 4 Cir. 3/13/02), 811 So.2d 1263, 1275 (Emphasis original). Accordingly, advising plaintiffs of their right to contest the amount of just compensation does not conflict with La. R.S. 38:301(C)(l)(c)’s mandate that the amount of just compensation, once determined, will be the only payment for the exercise of a permanent levee servitude. We do not find the Levee District failed to comply with La. R.S. 38:301(C)(l)(c). Yet even if plaintiffs had demonstrated the Levee District’s non-compliance with La. R.S. 38:301(C)(l)(c) and La. R.S. 38:30'l(C)(l)(f), in addition to its demonstrated non-compliance with La. R.S. 38:301(C)(2)(a), we do not find that such non-compliance entitles plaintiffs to the relief they seek. The three aforesaid subsections of La. R.S. 38:301 each employ “shall,” which generally denotes a mandatory duty. See Carter v. Duhe, 05-0390 (La. 1/19/06), 921 So.2d 963, 969 n.8; La. R.S. 1:3. Nevertheless, mandatory statutes generally prescribe, in.addition to requiring the doing of the thing specified, the 117result that will follow if they are not done, whereas, if directory, their terms are limited to what is required to be done. Carter, supra-, see also Marks v. New Orleans Police Dep’t, 06-0575 (La. 11/29/06), 943. So.2d 1028, 1035. Our review of La. R.S. 38:301(0(1)®, La. R.S. 38:301(C)(2)(a), and La. R.S. 38:301(C)(l)(c) lead us to conclude that these are directory statutes because they specify what is required but do not specify the effect or consequences of failing to adhere to the requirements. Plaintiffs have not offered any support for their position that the failure to adhere to these directory statutes warrants additional compensation. And absent any indication that the legislature intended such a result, we decline to supplement these statutes with: such penalty provisions. See Carter, supra at 970 (“[I]t is. not the function- of the judicial branch in a civilian legal system to legislate by inserting penalty provisions into statutes where the legislature has chosen not to do so.”). This assignment of error is without merit. Assignment of Error Two In their second assignment of error, plaintiffs contend that the district court erred in using January 25, 2010 as the date to calculate fair market value of the property. They argue that because the Levee District failed to comply with La. R.S. 38:301(C)(l)(f), the controlling date should have been April 18, 2011, the date plaintiffs formally abandoned their property. We reject this argument for three reasons. First, as we found above, the Levee District complied with La. R.S. 38:301(C)(l)(f). But even if there was noncompliance) La; R.S. 38r30l(C)(l)(f) is a directory statute that does not prescribe altering the date for calculating fair market value in the event of non-compliance. Second, it is well settled that “just compensation normally is to be measured by the market value of the property at the time of the taking Horne v. Dep’t of Agric., — U.S. -, 135 S.Ct. 2419, 2432, 192 L.Ed.2d 388 (2015) (Emphasis added), hslndeed, the Louisiana Supreme Court recently held that tee compensation owed a landowner “for the taking of, loss or damage to, his property by way of a permanent levee servitude for a hurricane protection project.. .is limited to that required by the Fifth Amendment, which is the fair market value of the property at the time of the appropriation[.]” Jarreau, 16-788, supra at 311 (Emphasis added). And third, statutory authority-dictates that the date the levee board formally adopts a resolution- acquiring a permanent or temporary levee servitude is the- date to 'be used for fair market value calculation. La. R.S. 38:301(C)(l)(h) states: The measure of compensation lands and improvements taken or destroyed for levee and levee drainage purposes by way of a permanent levee servitude shall be the fair market value.of the property taken or destroyed before the proposed use of the property or construction of the levee facilities, without allowing any change in value caused by the construction of the. levee facilities. And La. R.S. 38:301(C)(l)(g) defines “use” as: [T]he time the levee board formally adopts its resolution specifically describing an area to be utilized for levees and levee drainage purposes through the exercise or acquisition of a permanent levee servitude or a temporary servitude ■provided that actual use of the property commences 'within two years of the adoption of tee resolution. Because the Levee District appropriated plaintiffs’ property by resolution on January 25, 2010, we conclude that the district court did not err in using January 25, 2010 as the date for calculating the fair market value of plaintiffs’ property. This assignment of error is without merit. Assignment of Error Three[8] |i9In this assignment of error, plaintiffs argue that the district court erred in its valuation of the property by discounting Dr. Ragas’s analysis and conclusions. In an action regarding just compensation for appropriated property, a trial court’s factual determinations as to the value of property and entitlement to any type of damages will not be disturbed on review in the absence of manifest error. S. Lafourche Levee Dist. v. Jarreau, 15-328 (La. App. 1 Cir. 3/30/16), 192 So.3d 214, 220, aff'd in part, rev’d on other grounds in part, 16-788 (La. 3/31/17), 217 So.3d 298. Similarly, where the testimony of experts and witnesses is contradictory and the trial court decides to give more or less weight to the testimony of certain experts and witnesses, the trial court’s findings cannot be overturned unless manifest error appears in the record. Id. Opinions of experts regarding valuation are advisory and are used only to assist the trial court in determining the amount of compensation due. Id. The weight to be given to expert testimony is determined by the trier of fact based on the professional qualifications and experience of the expert, the facts and studies upon which the opinion is based, the familiarity with the locality of the property involved, and the possible bias of the witness in favor of the side for whom he testifies. Id. Where the experts disagree as to the value of the land taken, the trial court has much discretion in evaluating and determining the weight to be given to each expert. Id. Furthermore, those factual findings made by the trial court that do not directly involve the valuation of the property or the credibility of the appraisers are also entitled to deference, in accordance with the jurisprudential rules regarding the standard of review of factual findings. Jarreau, 15-328, supra. In all civil cases, the appropriate standard for appellate review of factual findings is the manifest error-clearly wrong standard, under which a court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Stobart v. State through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La. 1993); Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Thus, to reverse a trial court’s factual findings, the appellate court must: (1) find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) determine that the record establishes the finding is clearly wrong or manifestly erroneous. Stobart, supra. The issue to be resolved by a reviewing court is not whether the factfin-der was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart, supra. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of' credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Id. The reviewing court must always keep in mind that if the trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would.have weighed the evidence differently. Id. at 882-83. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with- the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Stobart, supra at 883. Thus, where two permissible views-of the evidence exist, the factfinder’s choice between them cannot be manifestly 'erroneous or clearly wrong. Id. With the foregoing in mind, we consider the district court’s reasons for judgment to gain insight into why it opted to accord lesser weight to Dr. Ragas’s valuation of the property: The Court considered the appraisal of Dr. Ragas and finds that not only was he in error as to the date of the evaluation but also in his methodology of valuation. His method used replacement costs, and his comparable sales value did not just limit itself to a price per square foot but included additions for items which are part of the structure. These included additions' for the elevator, stairs, porches, and site improvements such as landscaping, sewer, and driveways. The Court further finds that his price per square foot of the living area (the primary means of valuing residential properties) was-overpriced and did not take into account the inferior location of the Magee property, which this Court believes is the primary determiner of residential property values. The Magee property was-located on Walker Road, an unpaved 'roadway, was the only residence on Walker Road, and was adjacent to a junkyard; all of which the Magees admitted. Dr. Ragas gave no reduction for the superadequacy in-the construction of the property mentioned by all other experts compared to other residences used for comparables. Lastly, Dr. Ragas stated that the property could take as long as 1-2.5 years to sell but felt the price would be reduced by only $75,000.00, which the Court did not find credible. As the district court’s reasons for judgment make clear, the court found , several flaws in Dr. Ragas’s methodology of valuation. We consider each in turn to assess whether there is a reasonable factual basis in the record to support the court’s finding and whether the court abused its discretion in discounting Dr. Ragas’s analysis. First, the court found Dr. Ragas utilized the incorrect evaluation date of April 18, 2011. For our reasons stated above in assignment of error two, we find the court did not err in this legal conclusion.- Second, the court found Dr. Ragas’s use of replacement costs, ie., the cost approach, was not warranted in this case. Of the five experts considered by the court, three declined to utilize the cost approach in determining the fair market value of plaintiffs’ property.[9] Mr. Tatje opined that the cost approach “brings nothing to the table.-to help value this property in the marketplace,” which, he explained, is the foremost purpose of the appraisal process. Similarly, .Mr. Sandoz explained- that he gave the cost.approach in his appraisal of plaintiffs’ property “very little if any weight” because “it is rarely used .in the residential appraisal process”, as it is “not an accurate reflection of market value.” And Mr, Murphy, |g!>who did not testify at trial but whose report was introduced into evidence, performed the cost approach, but disregarded it in his final analysis, explaining: “The Cost Approach is not favored based on the fact that although the subject is of new construction, there are elements of functional obsolescence due to over-improvements which are ■ difficult to- measure.” We find the foregoing constitutes'a reasonable factual basis for the district court’s determination that the cost approach was not appropriate for appraising plaintiffs’ property in this case. Third, the court found Dr. Ragas erred in not limiting his comparable analysis to price per square foot, but included separate additions of value for the elevator, stairs, porches, and • site improvements such as landscaping, sewer, and driveways. With respect to the elevator, stairs, and porches, both Dr. Ragas and Mr. Core added separate values for each of these items—as is to be expected under the cost approach, utilized in their appraisals. On the other hand, both Mr. Tatje and Mr. Sandoz did not add separate values for the elevator, stairs, and porches, but accounted for them in their calculation of the price-per-square-foot value of plaintiffs’ property. With regard to the site improvements of landscaping, sewer, and driveways, Dr. Ragas and Mr. Core added separate values for .these items. Mr. Tatje’s report, indicates that he also added separate values for such site improvements as driveways and. landscaping. And Mr, San-doz’s report similarly reflects that he too added separate values for such site improvements. as a concrete pad,, access roads, and, as-he explained at trial, driveways.[10] Despite the court’s skepticism of'thisaspect of Dr; Ragas’s approach, in the end, the court followed his approach; at least in part, by including separate additions for the porches and site improvements in its calculation of the value of plaintiffs’ property, Regarding the porches, the court explained: “Although porches are normally not included in the fair market value because they are ‘ not cheated or cooled, most homes do not have porches that almost equal the living area and the Court finds this should be assigned some value and that $5/sq. ft, is reasonable,” And for the site improvements:, “Though normally not included, there were improvements for sewer, landscaping, and driveways, which the Court finds should be compensated and that $25,000.00 is .reasonable.” At the same time, however, the court declined to fully follow Dr. Ragas’s approach when it excluded separate additions for the elevator and stairs. In view of the foregoing, we find there is a reasonable factual basis in the record for the district court’s decision to exclude the value of the elevator, and stairs as separate additions, and a reasonable factual basis for its decision to include the value of the porches and site improvements as separate additions in calculating the value of plaintiffs’ property. Fourth, the court found Di*. Ragas’s price-per-square foot analysis failed to sufficiently account for the inferior location of plaintiffs’ property. Both Mr. Core and Mr. Tatje described the location of plaintiffs’ property on Walker Road as “rather remote” with “not a lot going on there.” Even Dr. Ragas acknowledged that plaintiffs’ property was the only house, exclusive of trailers, and one of the few instances of development at all on Walker Road. Yet, of the five experts, Dr. Ragas was the only one to grade the location of plaintiffs’ property as superior to all comparable sales of improved property he considered. Whereas Mr. Core, Mr. Tatje, Mr. Sandoz, and Mr. Murphy each graded the location of plaintiffs’ property as similar to all comparable sales of improved property they considered. And at trial, Mr. Tatje even added that he was “being generous” by not grading the location of plaintiffs’ property as inferior: If you look at the locations of all of these [comparable] sales, they are very densely developed, many, many homes similar to the sale in those locations. And if you look at the Walker Road location, you’ll find that there’s virtually nothing there. So obviously the market is telling you that people are going to these other locations to build |¾similar properties, not going to Walker Road. So I think I was probably being generous by not making any negative location adjustments. In light of the foregoing, we find there is a reasonable factual basis in the record for the district court’s determination that Dr. Ragas did not sufficiently account for the property’s inferior location. Fifth, the court found that Dr. Ragas gave no reduction for the superadequacy of plaintiffs’ property. “Superadequacy” is defined as “an excess in the capacity or quality of a structure or structural component determined by market standards.” Dr. Ragas testified that plaintiffs’ property is “not suffering from a. superadequacy, but that there would be in the marketplace some diminishment for the difference in cost between a wood structure and concrete and steel.” Conversely, three of the other experts reached different conclusions.[11] Mr. Core’s report described plaintiffs’ property as follows: “The concrete pile and monolithic concrete first and second floor foundation(s) and heavy grade steel framing of the walls, ceiling and roof structure of [the] Magee residence, along with other construction features and standards, are similar to those used in public and industrial building construction, not residential construction.” As compared to other properties, Mr. Core observed: “The residential improvements contained in the comparable sales are of standard or typical residential construction when compared to the subject’s atypical residential improvements.” Similarly, Mr. Sandoz observed in his report: “Although items like the steel and concrete structural members are very sturdy, hurricane resistant, and long lasting, they could constitute superadequacies (overbuilding) for which the typical residential market participant may, or may not, be willing to invest additional funds to enjoy, the. perceived benefits these improvements may provide.” IgsAnd Mr. Murphy found: A market survby indicates that the subject property improvements are not typical for the market area. The improvements are clearly built to plan for owner occupancy and were tailored to the likes of the property owner. The primary su-peradequacy would be the foundation and base costs such as the steel and concrete' piers. From a standpoint' of market value, the market might view some elements of the construction as an over-improvement[.] We find the foregoing forms a reasonable factual basis for the district court’s determination that Dr. Ragas did not sufficiently account for the superadequacy of plaintiffs’ property. Lastly, the court found incredible Dr. Ragas’s estimation that plaintiffs’ property remaining on the market for one to two- and-a-half years before being sold would account for a. $75,000 reduction in the sales price (an approximate reduction of between $82 and $205 per day). By contrast, Mr. Sandoz, in his comparable sales analysis of improved properties, noted one property that was initially listed at $649,000 remained on the market for approximately 311 days before being sold for $500,000 (an approximate reduction of $479 per day). Mr. Sandoz also noted another property that was initially listed at $450,000 remained on the market for 327 days before being sold for $330,000 (an approximate reduction of $367 per day). We find this testimony by Mr. Sandoz is a reasonable factual basis for the district court to decline to give credence to Dr. Ragas’s estimation of the value lost for time spent on the market. Upon our review, we conclude that the record contains reasonable factual bases to support each of the court’s several critiques of Dr. Ragas’s methodology. Because the trial court has much discretion in evaluating and determining the weight to be given to experts when they disagree as to the value of the land taken, Jarrean, 15-328, supra, we find that the district court did not abuse its discretion in giving more credence to the appraisals of the other experts than to that of Dr. Ragas. | ^Bearing in mind that expert opinions regarding valuation of property are advisory and are used only to assist the trial court in determining the amount of compensation due, Jarrean, 15-328, supra, we now assess the district court’s calculation of just compensation in light of the expert testimony. Utilizing January 25, 2010 as the effective date, the court estimated the value of the property before at $754,430 and the value after at $100,000. Accounting for the loss of value from the terminated three-year temporary servitude at $4,000, the court concluded just compensation was $658,430. To place these figures in context, the following chart is included: Market Value - Before Market Value - After[12] Temporary Servitude Value Just Compensation[13] Sandoz $545,000 $101,400 $2,700 $446,300 Tatje $595,000 $102,000 $4,800 $497,800 Murphy $644,745 $108,765 $3,237 $539,217 Core $720,000 $139,688 $3,660 $583,972 Ragas $1,325,000 $149,600 $4,109 $1,179,509 The Court $754,430 $100,000 $4,000 $658,430 After reviewing the entire record and exhibits, and paying particular attention to the expert testimony, we cannot find that there is no reasonable factual basis in the record for the district court’s calculation method or that the district court manifestly erred in its calculation. As the variance among the experts’ opinions and appraisals illustrates, the determination of fair market value is not an exact science and the district court’s methodology in its calculation is reasonable and not manifestly erroneous in light of the expert testimony offered at trial. This assignment of error is without merit. Assignment of Error Four In this assignment of error, plaintiffs argue that the district court erred in awarding attorneys’ fees at twenty-five percent of the judgment in accordance with |j>7La. R.S. 38:301(C)(2)(f). They contend that attorneys’ fees should be awarded pursuant to La. R.S. 13:5111. The Louisiana Supreme Court resolved this issue in Jarrean, 16-788, supra, ruling that La. R.S. 38:301(C)(2)(f) governs attorneys’ fees in cases like this one. The Court explained: Although La. R.S. 13:5111 applies generally to all cases where property is “taken” for any purpose by any method other than expropriation, La. R.S. 38:301(C)(2)(f) is tailored specifically to matters involving the taking, use, damage, or destruction of property for levee purposes pursuant to La. R.S. 38:301, as in this case. The rules of statutory construction dictate that La. R.S. 38:301(C)(2)(f) should prevail as the exception to the general rule provided by La. R.S. 13:5111. Jarrean, 16-788, supra at 314 (Emphasis original). La. R.S. 38:301(C)(2)(f) mandates that “attorneys’ fees shall not exceed twenty-five percent of the difference between the award [of the court] and the amount found to be due by the state, the levee board, or the federal government.” The difference between the state’s offer of just compensation of $583,972 and the court’s of $658,430 is $74,458. Thus, in accordance with La. R.S. 38:301(C)(2)(f), the district court did not err in its award of attorneys’ fees in the amount of 25 percent of the $74,458 judgment. This assignment of error is without merit. Assignment of Error Five In this assignment of error, plaintiffs argue that the district court erred in awarding legal interest on the judgment from the date of judicial demand rather than from the date of the taking. We find merit to this argument. Although statutory authority is silent on this matter, jurisprudence supports plaintiffs’ position. Recently, in Jarrean, the Louisiana Supreme Court affirmed an award of just compensation for an appropriation of a levee servitude, “plus interest from the date of the appropriation.” Jar-rean, 16-788, supra at 312.12sAdditionally, in an inverse condemnation case, this Court has held proper the awarding of interest on a judgment of just compensation and damages “from the date of the taking rather than from the date of judicial demand.” Sid-Mar’s Rest. & Lounge, Inc. v. State, 15-326 (La. App. 5 Cir. 12/09/15), 182 So.3d 390, 403-04. In light of this jurisprudence, we find the district court erred in awarding interest from the date of judicial demand. Accordingly, we amend in part the district court’s January 17, 2017 judgment to provide that interest accrues from the date of the appropriation, January 25, 2010, and affirm the judgment as amended. DECREE For the foregoing reasons, we amend in part the district court’s January 17, 2017 judgment to provide legal interest accrues from the date of the appropriation, January 25, 2010, and affirm the judgment as amended. We also affirm the' district court’s March 6,2017 judgment. AMENDED IN PART; AFFIRMED AS AMENDED . Mr. Sandoz’s after-value of $98,700 already includes a deduction of the value of the terminated temporary servitude ($2,700). Thus, the after-value of the property including the value of the temporary servitude is $101,400. . LaPAC is a contractor for the Louisiana Office of Coastal Protection and Restoration Authority. LaPAC offers a range of property acquisition services, including appraisals and just compensation payments. .Like Mr. Sandoz, Mr. Murphy’s after-value of $105,528 already includes a deduction of the value of the terminated temporary servitude ■ ($3,237). Thus, the after-value of the properly including the value of the temporary servitude is $108,765. ; It was explained thát the $600 check was issued to correct a clerical error and ensure payment of the proper amount of compensation. . Article I, § 4(E) provides: "This Section shall not apply to appropriation of property necessary for levee and levee drainage purposes.” . La. C.C. art. 665 provides: Servitudes imposed for the public or common utility relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers and for the making and repairing of levees, roads, and other public or common works. Such servitudes also exist on property necessary for the building of levees and other water control structures on the alignment approved by the U.S. Army Corps of Engineers as provided by law, including the repairing of hurricane protection levees. All that relates to this kind of servitude is determined by laws or particular regulations. . Moreover, three of these cases were decided under the Louisiana Constitution of 1921 and all were decided prior to the 2006 amendments to Article I, § 4 and Article VI, § 42. See Janean, supra at 305-11 (discussing the differences between the constitutions of 1921 and. 1974 and the changes enácted by. the 2006 amendments). . The matters argued under Assignments of Errors Three, Four, and Five in the argument section of plaintiffs’ brief do not correspond to the assignments of error as numbered earlier in their brief. Under Assignment of Error Three in the argument section, plaintiffs argue that the district court erred in not adopting the factual findings of Dr. Ragas. (This was not assigned as an error previously in plaintiffs' brief). Under Assignment of Error Four in the argument section, plaintiffs argue that the district court erred in fixing attorneys’ fees at twenty-five percent of the judgment. And under Assignment of Error Five in the argument section, plaintiffs argue that the district court erred in ordering legal interest from the date of judicial demand rather than from the date of taking. Plaintiffs omit argument on the assigned error dealing with the issue of Dr. Ragas’s expert fees. It is well established that the court may consider as abandoned any assignment of error or issue for review that has not been briefed, See Khoobehi Props., LLC v. Baronne Dev. No. 2, L.L.C., 16-506 (La. App. 5 Cir. 03/29/17), 216 So.3d 287, 300, writ denied, 17-893 (La. 9/29/17), 227 So.3d 288 (citing Rule 2-12.4(B)(4) of the Uniform Rules of Louisiana Courts of Appeal). Accordingly, the issue of Dr. Ragas’s expert fees has been abandoned and is not considered by this Court. , Dr. Ragas and Mr, Core both utilized the cost approach in determining the fair market value of plaintiffs’ property. . Mr. Murphy’s report did not provide a basis from which comparable information could be ascertained. . A discussion of superadequacy was not included in Mr. Tatje’s report or his testimony at trial. . These figures include the value of the temporary servitude. See n.l and n.3, supra. . Just Compensation = (Market Value-Before - Market Value-After) + Temporary Servitude Value